327 P.3d 931

STATE of Hawai'i, Respondent/Plaintiff–Appellee,

v.

Maryann ACKER, Petitioner/Defendant–Appellant,

and

William Gerald Acker, Respondent/Defendant.

No. SCWC–30205.

Supreme Court of Hawai'i.

Feb. 14, 2014.

Keith S. Shigetomi, Honolulu, for petitioner.

Brandon H. Ito, for respondent.

RECKTENWALD, C.J., NAKAYAMA, J., and Circuit Judge NACINO, Assigned in Place of POLLACK, J., Recused, with ACOBA, J., Concurring and Dissenting Separately, with whom McKENNA, J., Joins.

Opinion of the Court by
RECKTENWALD, C.J.

Maryann and William Acker, a newly married couple, were involved in a series of crimes in California and Hawaiʻi during June, 1978. On June 10, 1978, Maryann went to a Waikiki bar and began conversing with Joseph Leach. William joined the conversation and introduced himself as Maryann's relative. Leach subsequently gave a ride to William and Maryann. During the drive, William pulled a gun on Leach, demanded his wallet, and ordered that he drive to Hanauma Bay. At Hanauma Bay, Leach was bound and taken to a secluded area off of the road. William and Maryann then left in Leach's vehicle.

On June 18, 1978, Maryann met Lawrence Hasker at a Waikiki bar. William, again posing as a relative of Maryann, joined the conversation and asked for a ride home. Hasker agreed to give William and Maryann a ride. Hasker was subsequently robbed at gunpoint and the three proceeded to Hanauma Bay. While at Hanauma Bay, Hasker was fatally shot.[1] William and Maryann then left Hawaiʻi for California.

On June 24, 1978, William and Maryann were hitchhiking through California and were picked up by Cesario Arauza. Arauza was fatally shot and his body was later discovered by the side of the road. Maryann and William then engaged in several robberies before Maryann was apprehended. William fled California, but eventually turned himself in.

In July 1978, William and Maryann were charged in California with Arauza's murder. Following a jury waived trial, Maryann was convicted of Arauza's murder, but was acquitted of the allegation of use of a firearm. William, who was cooperating with authorities and had divulged information regarding the Leach and Hasker incidents in Hawaiʻi, pleaded nolo contendre to the murder of Arauza.

---

1. As set forth below, the State contends that Maryann shot Hasker, while Maryann contends that it was William who fired the gun.

In August 1981, William and Maryann were indicted in Hawai'i for various charges relating to the Leach and Hasker incidents. William pleaded guilty to robbing Hasker and agreed to testify against Maryann. Maryann was subsequently found guilty of the charges regarding the Leach incident and Hasker's murder. Maryann appealed to this court, which affirmed her convictions.

In 1991, William testified under oath at a parole hearing in California that he was solely responsible for Hasker's murder.

Maryann eventually filed a Hawai'i Rules of Penal Procedure (HRPP) Rule 40 petition for post-conviction relief, and was granted a new trial in 2007 in relation to the charge for Hasker's murder. At the retrial, which is the basis for the instant appeal, the State was allowed to introduce evidence of the Leach incident, the Arauza murder, and the California robberies. Maryann was again convicted of Hasker's murder, and the Intermediate Court of Appeals affirmed her conviction.

In her application, Maryann asserts that she was denied a fair trial because: (1) the circuit court erred in ruling that she had opened the door, during the cross-examination of William, to the admission of "bad acts" evidence regarding her involvement with William in the murder of Arauza in California; (2) the circuit court erred in denying a mistrial after Hasker's friend, Timothy Millard, testified regarding a police request that Millard take a lie detector test; (3) the prosecution engaged in misconduct by improperly cross-examining her using information in her presentence report and by making false and misleading statements during rebuttal closing; and (4) the circuit court erroneously refused to enforce a subpoena recalling William to testify in Maryann's case. In addition, Maryann contends that the circuit court's jury instructions on murder and accomplice liability were erroneous, and that the cumulative effect of these errors violated her right to a fair trial.

We hold that the circuit court erred in its determination that defense counsel opened the door to evidence concerning Maryann's convictions in California. Nevertheless, such evidence was admissible under Hawai'i Rules of Evidence (HRE) Rule 404(b), and relevant to rebut Maryann's suggestion that she was acting under duress in the Hasker incident and to establish intent and a common plan. Thus, the circuit court's error regarding the basis for admitting this evidence was harmless beyond a reasonable doubt.

We also conclude that the circuit court did not abuse its discretion in denying Maryann's motion for mistrial because it struck the testimony of Millard regarding the lie detector test and instructed the jury to disregard that testimony. We further conclude that the prosecution did not engage in prosecutorial misconduct, and that the circuit court did not abuse its discretion in denying Maryann's request to extract William during Maryann's case and instead allowing a deputy sheriff to testify regarding William's refusal to testify. Finally, we hold that the challenged jury instructions were not prejudicially insufficient, erroneous, inconsistent, or misleading.

Accordingly, we affirm the ICA's judgment.

## I. Background

The following factual background is taken from the record on appeal, and recounts the various court proceedings related to this case.

### A. Arauza Case

On June 28, 1978, Maryann was arrested while driving Arauza's vehicle. William subsequently turned himself in on July 1, 1978. On July 20, 1978, Maryann and William were charged in California with the murder of Arauza. The charge alleged that in the commission of the offense, William and Maryann "personally used a firearm, to wit a 38 caliber revolver[.]" Maryann and William were also charged with committing two unrelated robberies. Maryann was charged with an additional unrelated robbery.

The cases against William and Maryann were severed for trial. William pleaded nolo contendere to the murder of Arauza, which included the use of a firearm allegation. William also pleaded nolo contendere to the two charged robberies. William was sentenced

to life imprisonment with the possibility of parole.

After a bench trial, Maryann was found guilty of Arauza's murder, but the court found the use of a firearm allegation to be "not true and order[ed][it] stricken." Maryann also was convicted of the three charged robberies, and was sentenced to life imprisonment.

## B. Initial Trial in Hawai'i

On August 19, 1981, Maryann was charged with: kidnapping Leach; robbing Leach; exerting unauthorized control of Leach's vehicle; kidnapping Hasker; robbing Hasker; murdering Hasker in violation of HRS § 707-701;[2] exerting unauthorized control of Hasker's vehicle; and burglarizing Hasker's residence. William was charged with the same offenses as Maryann, except that he was not charged with Hasker's murder. Pursuant to a plea agreement, William pleaded guilty to robbing Hasker in exchange for his testimony against Maryann. All other charges against William were dismissed.

William was called as a prosecution witness at Maryann's first trial in 1982, and testified that Maryann shot Hasker. William testified that he pleaded nolo contendere to Arauza's murder, even though he believed Maryann had shot and killed Arauza, because he thought he was responsible for her actions under California's felony murder rule. William, thus, suggested to the jury that he pleaded guilty to felony murder, when he in fact pleaded nolo contendere to murder and the use of a firearm allegation. The circuit court also allowed other individuals to testify regarding the Arauza incident.

Maryann was subsequently found guilty as charged on all counts. On the murder conviction, Maryann was sentenced to a term of life imprisonment with the possibility of parole, and a mandatory minimum term of ten years.

Maryann appealed her conviction to this court and argued in relevant part that the trial court erred in permitting evidence of her other crimes because:

[T]he Arauza case was not relevant to establish any of the exceptions to [HRE] Rule 404. It did not provide motive since the Arauza case occurred after the present case, and the two cases were not related. It did not prove opportunity since the crimes were committed several days and several thousand miles apart from each other. It did not prove preparation or plan since no common or continuing scheme was established by the State. It did not prove intent, knowledge, or absence of mistake or accident since these were not issues at trial.... It did not establish identity since [Maryann] testified that she was present at the general scene of the shooting. Finally, it did not prove modus operandi since the two crimes were dissimilar in nature....

Assuming, arguendo, that one or more of the exceptions were relevant, the prejudice against [Maryann] far outweighed any probative value in view of the issues and the evidence available to the State.

This court issued a Memorandum Opinion affirming Maryann's convictions, stating that it found "no merit" to any of Maryann's arguments.

## C. Hawai'i Rules of Penal Procedure (HRPP) Rule 40 Petition

Maryann filed an HRPP Rule 40 Petition for Post-Conviction Relief on August 15, 2000, arguing, inter alia, that: (1) her murder conviction should be dismissed, or she should receive a new trial, because William admitted during a parole hearing before the California Parole Board that he was responsible for Hasker's murder; and (2) she was denied a fair trial because the State did not disclose that William pleaded nolo contendere to first degree murder with the use of a firearm in California and was sentenced to life imprisonment with the possibility of parole for that offense. *Acker v. State*, No. 27081, 115 Hawai'i 476, 2007 WL 2800803, at *1 (Haw.App. Sept. 27, 2007) (SDO). The circuit court granted Maryann's HRPP Rule 40 Petition, vacated her conviction and sentence, and or-

---

2. HRS § 707-701 (1976), provided in relevant part: "a person commits the offense of murder if he intentionally or knowingly causes the death of another person."

dered that she receive a new trial for all counts. *Id.* On appeal, the ICA determined in relevant part:

> The State did not disclose to [Maryann] that William had pleaded nolo contendere to both murdering Arauza and using a gun in the commission of that murder. Thus, contrary to the impression left by William's testimony, his first degree murder conviction in California had not been based on a felony murder theory, but on the allegation that he had been the person pulling the trigger. The State also failed to disclose to [Maryann] that William had been sentenced in California to life with the possibility of parole and, instead, disclosed an FBI "rap sheet" that erroneously reported William's sentence as life without parole.
>
> We conclude that the State's failure to disclose the true facts concerning William's nolo contendere plea, conviction, and sentence in California denied Acker her right to a fair trial on her Murder charge.

*Id.* at **2–3.

Accordingly, the ICA affirmed the circuit court's order to the extent that it vacated Maryann's murder conviction and ordered a new trial on only that count. *Id.* at *3.

### D. Retrial on the Hasker Murder Charge

#### 1. Circuit Court Proceeding

##### a. Pre–Trial

The State filed a Notice of Intent to Use Evidence, in which it sought to admit evidence of the Leach and California incidents, as well as evidence of the additional Hasker convictions, i.e., robbery, kidnapping, burglary, and unauthorized control of propelled vehicle.

Maryann opposed the notice of intent to use the prior evidence. Maryann argued, "Besides the problems of allowing William to again lie regarding the Arauza matter, [3] evidence of that incident is prohibited by [HRE] Rule 404(b)[.] Nothing in the Arauza incident makes William's assertion that Mar-

---

**3.** As will be discussed further infra, Maryann appears to be referring to William's 1991 testimony before the California Parole Board, in which he testified that he shot both Hasker and

yann shot Hasker any more or less probable."

At a subsequent hearing, the circuit court stated that it would allow in the Leach incident, and that it would keep out the Arauza incident "unless the door is open[ed]":

> What worries me is if William [ ] gets on the stand and says he is pure as the driven snow and he has constantly told the truth, we're going to get into whether or not he lied in this Court, in the Circuit Court, lo these—whatever many years ago it was.
>
> . . . .
>
> And whether he—or whether he lied up in California and pled to being the shooter. And we'll get to that. But if the door is opened, we're going to have to go down that road[.]

The circuit court subsequently entered its Findings of Fact, Conclusions of Law, and Order which provided in relevant part:

#### FINDINGS OF FACT

6. From March 16, 1982 to March 31, 1982, [Maryann] proceeded to trial in the [circuit court], on the offenses involving [ ] Leach and [ ] Hasker. The original trial court allowed the State to present evidence of [Maryann's] complicity in the murder of [ ] Arauza in its case in chief.

. . . .

8. On June 2, 1982, [Maryann] filed Notice of Appeal of her convictions for the crimes involving [ ] Leach and [ ] Hasker, including the murder of [ ] Hasker. In her Opening Brief, filed December 29, 1983, [Maryann] advanced as point of error "C" that "The Trial Court erred in permitting evidence of [Maryann's] prior crimes."

. . . .

9. On December 11, 1984, the Hawai'i Supreme Court issued its Memorandum Opinion affirming [Maryann's] convictions . . . and establishing the "law of the case."

. . . .

---

Arauza and that Maryann did "[a]bsolutely nothing[,]" which contradicted his testimony at Maryann's initial trial that she told him that she shot Arauza.

## CONCLUSIONS OF LAW

. . . .

7. In the instant case, the cogent reasons supporting the Court's denial of State's request to admit evidence regarding [Maryann's] complicity in the murder of [ ] Arauza are:

a) [William's] plea of nolo contendere to the offense of Murder ... and the included allegation of use of a firearm ... for the murder of [ ] Arauza;

b) [Maryann's] conviction for offense of Murder ... and the court's rejection of the included allegation of use of a firearm[;]

c) [William's] sentence for the offense of Murder and the included allegation of use of a firearm for the murder of [ ] Arauza was life with the possibility of parole, a fact which was known to the State but not to the Court or [Maryann] at the time of trial in 1982. Evidence that [William] had plead [sic] nolo contendere to being the shooter and murdering [ ] Arauza would have served to undermine and impeach his claim that [Maryann] had shot [ ] Arauza. It would also have served to contradict [William's] explanation for pleading to [ ] Arauza's murder and cast [William's] role in the murders of [ ] Arauza and [ ] Hasker in a different light to the jury. Competent defense counsel could also have used [William's] sentence of life with the possibility of parole to attack [William's] interest and motives for cooperating with the State and placing blame on [Maryann]. Finally, the belief that [William] had been sentenced to life without the possibility of parole may have influenced defense counsel to tread lightly in attacking [William] on bias and caused the trial court to find that evidence concerning [William's] sentence was not relevant. [William's] testimony was critical to the State's murder prosecution. The State's non-disclosures of the true facts concerning [William's] California plea, conviction, and sentence deprived [Maryann] of valuable evidence that could have been used to forcefully impeach [William's] credibility.

8. Upon revisiting the issue of the admissibility of the evidence of [Maryann's] complicity in the murder of [ ] Arauza in its case in chief, this Court concludes as a matter of law, the State is not permitted to present such evidence in its case in chief for the cogent reasons listed above.

In her Third Motion in Limine, Maryann requested that the circuit court preclude the State from calling William as a witness because the State was aware that his testimony was "false" and, if allowed, "would be suborning perjury." Alternatively, Maryann requested that she be allowed to introduce evidence that William failed a polygraph examination during the initial investigation into Hasker's murder, refused to take another polygraph examination, and was still given immunity for his role in the instant case. In addition, Maryann noted that on May 2, 1991, and while under oath, William stated that he "committed the murder for which he was incarcerated (California), that he pulled the trigger and that he committed the murder in Hawaii[.]" Attached as Exhibit C to Maryann's Third Motion in Limine were excerpts from William's May 2, 1991 hearing before the California Board of Prison Terms (California Parole Board). The transcript indicates that the following exchange occurred between William and a commissioner on the Board:

COMMISSIONER [ ]: ... Did you commit the murder for which you're in custody?

[William]: Yes, I did.

COMMISSIONER [ ]: What about the one in Hawai'i?

[William]: I committed them all and I want the woman behind it, the woman that's incarcerated, I would like her set free.

COMMISSIONER [ ]: Okay. So [Maryann] didn't do anything?

[William]: Nothing. Absolutely nothing.

COMMISSIONER [ ]: And is this the first time you've said that?

[William]: The very first time.

At a hearing on Maryann's motions, the circuit court considered whether Maryann would be allowed to cross-examine William about his statements to the California Parole Board in 1991. The following conversation occurred:

[Defense]: . . . I realize that the fact that [William] failed a polygraph examination is not admissible. I will grant the court that and I'll grant the State that. However, I think that it's fair for me to ask that you were—before entering into agreement you were asked to complete certain tasks which you failed but nevertheless you still got a plea agreement. I don't have to come out and say, did you fail—didn't they tell you to take a polygraph test and you failed it? But, I'm saying, hey, you were asked to complete certain tasks before we would accept you as a witness and you failed those tasks but they still accept him as a witness.

THE COURT: What task other than the polygraph which I can't let in?

[Defense]: That's what I'm saying. I'm not going—

THE COURT: Just that one task?

[Defense]: Yes. I mean, that's a pretty big task. He lied. But I'm not going to term it that way. I can simply say, you were asked to complete a task, you failed that task, nevertheless they still gave you this plea agreement. And obviously I can bring up all the lies he had at trial.

THE COURT: If he takes the stand here in this court, you're going to cross him on what he said in 1991 to the Paroling Authority, is that right, where he basically said he did it, [Maryann] did not do it?

[Defense]: Yes.

THE COURT: And he'd like her to go free?

[Defense]: Yes.

THE COURT: And you don't want to stop there, you want to also say he also didn't perform this earlier task?

[Defense]: Yes.

THE COURT: The jury's not going to understand that. It's another vague thing but I understand your position.

. . . .

[State]: . . . [j]ust so long as the court's clear, if he goes there, the State's position is: can of worms.

. . . .

THE COURT: . . . Well, I'm going to obviously let [William] testify subject to vigorous cross. Court will not let in the—and you have a good record on . . . the polygraph failure. If that's the only reason, I don't even want you to ask that question at this particular point but you certainly can cross him based upon what he told the Paroling Authority. After he was divorced from [Maryann] he testified in this court in 1991 he basically wanted to exculpate her, and that I'll decide at the time the scope beyond that.

At a subsequent hearing, defense counsel noted his understanding from the initial hearing on the Motions in Limine that if he attempted to use William's statements before the California Parole Board to show that William "committed perjury[,]" then "the door could be opened" to the Arauza incident. Defense counsel then stated: "[I]f I can't bring in the fact of [William's] reputation and his admission of perjury, then I don't think I'm doing my job. If the Court says that by bringing that in, I open the door, then so be it, but if that's what happens, that's what happens." The State argued that cross-examining William on his statements to the California Parole Board would lead to the State asking why his story changed. The State contended that William's answer "is going to be, well, because he was approached by [Maryann's] attorney, who told him if he told the paroling authority that he did it, they'd let her out, which is going to bring in the back that she's serving a life sentence in California[,]" thus opening the door to the Arauza incident. The circuit court then stated, "That makes sense to me[,]" and asked defense counsel, "How are we going to get around that, the California situation?" Defense counsel then replied: "If California comes in, California comes in

for the whole thing, Judge. I'm not trying to ... just nip and tuck things. If it comes in, it comes in." The State subsequently stated:

Just to clarify, the only way then that California should come in, if at all, through [defense counsel] is if he confronts William [ ] with his statement to the [California] paroling authority, at which point I get to bring in evidence of her conviction because that goes to his reason why he said that— made that statement.

Defense counsel replied "That's my under-standing[,]" and the circuit court stated, "Fair enough."

In its Order granting in part and denying in part Maryann's Third Motion in Limine, the circuit court determined, inter alia:

IT IS HEREBY ORDERED that [Mar-yann's] Third Motion In Limine is hereby GRANTED IN PART, [Maryann] may question William [ ] on his 1991 statement to the California Parole Board, subject to proper foundation being laid;

IT IS FURTHER ORDERED that should [Maryann] question William [ ] on his 1991 statement to the California Parole Board, the State may then introduce evi-dence of William['s] reasons for making that statement, including [Maryann's] con-viction and sentence for the murder of [ ] Arauza in California.

IT IS FURTHER ORDERED that [Maryann's] Third Motion In Limine is hereby DENIED IN PART, William [ ] may testify; [Maryann] may not introduce evidence of failed or refused polygraph tests, and Defense Counsel shall approach the bench and obtain a ruling prior to attempting to introduce any evidence of or mentioning William['s] informant activities.

### b. Trial

#### i. William's Testimony

William acknowledged that he received a plea agreement with the State when he testi-fied against Maryann at her initial trial, un-der which all of the other charges against him were dropped in exchange for pleading guilty to robbing Hasker and testifying against Maryann. William was sentenced to twenty years incarceration for the robbery charge, which he had completed prior to Maryann's retrial. William then stated that no one made any promises to or agreements with him in exchange for his testimony at Maryann's retrial.

William stated that he and his then-wife Maryann came to Hawai'i in June 1978 after Maryann purchased round trip tickets. Wil-liam brought a ".38 Special" gun and a hunt-ing knife with him to Hawai'i. William and Maryann eventually "[ran] out of money." To deal with their financial situation, William and Maryann were "going to sell bunk mari-juana to tourists." William explained that Maryann would get "dolled up" and go to bars in Waikiki to look for tourists. William continued:

[Maryann's] there to meet dudes, guys, men, and find out everything she can about them. I'm going to sell them bunk mari-juana. And if we find out they're leav-ing—if we are there Friday and Saturday and Sunday, and they are leaving Monday, well, what are they going to do when they find out they got a bag of nothing?

. . . .

I come up to her and I give her the signal, either some kind of facial or I walk up, you know, walk up to her, say, "What's up, sis". She was like usually my sis when she's meeting these guys. I would come up to her and I would be like her brother.

. . . .

And I tell her, hey, let me talk to you a minute. I pull her aside, what's up. And she'd give me the low down on what's happening with the Vick [sic].

. . . .

If the guy is good, I take him to the park, get him high, he buys it, he leaves. You know, very seldom was a gun pulled or in play. Sometimes it was.

Maryann kept the gun and the knife in her purse "if it had to" be used. Maryann "could have left any time if she wasn't on board" with their plan.

William stated that on June 10, 1978, Mar-yann met Leach. William could tell that Leach was not a tourist and did not want to sell "bunk" to Leach. Maryann wanted to

"just play it out" with Leach because Leach had a lot of money. William and Maryann agreed to rob Leach, rather than try to sell him "bunk" marijuana. Maryann, William, and Leach left in Leach's car. While in the car, William "pulled the gun on [Leach] and told him this [was] a robbery." William instructed Leach to drive to Hanauma Bay and to give his wallet to Maryann, and Leach did so. When they arrived at Hanauma Bay, William tied Leach up and gagged him, while Maryann pointed the gun at Leach. William and Maryann left Hanauma Bay in Leach's car and took things out of his trunk.[4]

On June 19, 1978, William and Maryann kidnapped and robbed Hasker. Maryann got "dolled up," went to the Garden Bar, and met Hasker.[5] William approached Maryann and Hasker, and asked, "What's happening, sis." William got the impression that Hasker was a drug dealer and discovered that Hasker was local. William told Maryann to stop talking with Hasker so that they could rob a tourist. Maryann responded, "No.... He's got big money, he's a dealer." William agreed and asked Hasker for a ride back to their apartment, and Hasker agreed. When they arrived, Maryann and William went into the bedroom and discussed their plan. William again insisted that Hasker be taken home, to which Maryann responded, "No, let's take him. He's got cocaine, he's got big money[.]" William agreed, grabbed the gun from Maryann's purse, pointed it at Hasker, and said, "This is a robbery, man." Maryann then tied Hasker's hands behind his back, and drove with William and Hasker to Hasker's apartment. William then told Maryann to go inside and "get the cocaine and the

money." Maryann left and came back twenty minutes later with money and marijuana, but no cocaine.

Maryann then drove William and Hasker to Hanauma Bay. Maryann parked the car and William told Hasker to exit the vehicle and walk down a grassy knoll. Maryann had the gun pointed at Hasker. Hasker stated that he needed to urinate. William told Maryann that they should leave, to which Maryann responded, "Wait, I want to make sure he does what you tell him to do." William stated, "[Hasker] took a leak first.... He zipped up and he turned toward her. And she pulled the gun and went (witness making shooting sound) shot him, fire came out of the gun three times." Maryann was approximately "[t]en, fifteen feet" away from Hasker when she shot him.[6] William stated that he did not threaten or force Maryann to go along with their plan: "We did this together. There was no force. She wasn't compelled to do anything. At any time she could have left. Any time."

On cross-examination, William was asked, "Do you ever lie under oath, commit perjury as it pertains to Maryann?" William responded, "Yeah, I—[,]" at which point the State objected. At a bench conference, the State argued that the question "opens the door" to William explaining his answer. The circuit court overruled the objection and allowed defense counsel to proceed. Defense counsel then asked William, "[h]ave you ever committed perjury as it pertains to Maryann?" William stated that he "never lied in court." Defense counsel then asked, "have you ever lied under oath as it pertains to

---

4. Although Leach was unavailable to testify at Maryann's retrial, his testimony from Maryann's initial trial was read into the record, without objection. Leach's testimony regarding his robbery was similar to the testimony provided by William.

5. Timothy Millard testified that on June 19, 1978, he and Hasker made plans to meet at the Hilton Hawaiian Village. Millard, however, did not show at the Hilton Hawaiian Village that night. A few days later, Millard was questioned by police officers. Millard stated: "They asked me if I would take a lie detector test, asked me a lot of questions like where were you and all this and all that. And apparently, you know, I answered all the questions and everything to their liking."

Defense counsel objected, and the circuit court struck the testimony from the record, and instructed the jury to "disregard and also not speculate on any other police activity."

6. Dr. William Goodhue, First Deputy Medical Examiner for the City and County of Honolulu, testified that Hasker's death was caused by a "fatal penetrating gunshot wound" to the head, and that Hasker had a penetrating gunshot wound to his left lower leg. Dr. Goodhue testified that he could not determine the distance from the muzzle of the gun to the wound for the head injury, but estimated that the distance from the muzzle of the gun to the leg wound to be "six to eleven or twelve inches[.]"

Maryann?" William then asked the circuit court, "does a board hearing count?" The circuit court responded, "If it's under oath, yes. I don't know what the board—I assume we are talking about a California board hearing; is that right?" A bench conference was held, and the following conversation occurred:

> THE COURT: He can't get into the California Paroling Authority?
>
> [State]: This is exactly what I was talking about.
>
> . . . .
>
> [Defense]: Let me make my—I simply asked him have you ever committed perjury, lied under oath, and he's saying—
>
> THE COURT: Are you going to get into him going before the California Paroling Authority?
>
> [Defense]: Not right now.
>
> THE COURT: Do you want to get into that?
>
> [Defense]: I'm not sure.
>
> THE COURT: If you told him—that's a different story there, you can't get into that, what he told them?
>
> [Defense]: Judge, the ruling was the California stays out unless I open the door, and I'm not opening the door right now.
>
> . . . .
>
> THE COURT: Let me strike it and start all over again after I have a thorough hearing, I know where you're heading. You're going to have to make offers of proof. I will give you a lot of latitude.
>
> [Defense]: Well, Judge, you know, I don't think you should strike it right now. You can just tell me to stop going any further, but I don't think you should strike it right now because I am entitled to open the door if I choose to open the door.
>
> . . . .
>
> THE COURT: I'm going to strike it now, let you reinitiate it if need be. I want to make—I'm giving you a lot of latitude.
>
> [Defense]: I understand that, Judge.
>
> THE COURT: And you kind of wiggled the doorknob, but you haven't opened it.

The circuit court struck "that last whole series of questions about perjury and the answers" and directed the jury to disregard those questions and answers.

Defense counsel then asked William about a 1978 report in which he admitted to using cocaine since the age of 18, using one to two grams of cocaine on a daily basis for approximately three months, and supporting his cocaine habit by selling narcotics and robbing individuals. William stated that he lied to the report writer so that he could go to a "rehab center as opposed to prison." William stated that he would lie to get himself out of prison, but he would not lie under oath. At another bench conference, defense counsel then stated, "[William] just said he wouldn't lie under oath. Now I can ask him." Defense counsel then informed the circuit court that he would ask William "[i]f he's ever committed perjury, he's lied under oath." The circuit court stated, "[s]ounds like you are going to open the door." Defense counsel then replied, "I'm thinking about it, but I'm not going to do it right now." The following testimony was then elicited:

> [Defense]: My question then is to you, [William], have you ever lied under oath as it pertains to anything about Maryann? [William]: Probably.
>
> [Defense]: Probably. Does that mean yes?
>
> [William]: Yeah, that means yes.
>
> [Defense]: Okay.
>
> [William]: But not in court.
>
> [Defense]: And so when you lie—I'm sorry. When you lied under oath about Maryann, was there any repercussion to you?
>
> [William]: No.
>
> [Defense]: No.
>
> [William]: No, there wasn't because there wasn't a lie on her. I'm trying to do something for her.

Defense counsel then requested a recess and the trial ended for the day.

The next day, the circuit court expressed its concern that the door may have been opened on the Arauza matter: "It strikes me that the door may well have been opened for

a variety of reasons to the California situation, either under the rule of [ ] completeness or the rule of relevance and under [HRE] Rule 611."[7] Defense counsel argued that the door was not opened. The State asserted that the door was opened as to Maryann's prior convictions:

> Your Honor, the only reason that the door has been opened at this point is because William [ ] said on the stand that he was lying for [Maryann]. What was happening at the time was that he believed he had been approached by some folks who said that they represented Maryann [ ]. He believes that they were from the Innosense [sic] Project. He does not know for sure and he did not attempt to confirm.

Defense counsel then stated:

> Your Honor, I didn't bring in his statement. The order says if I bring in his statement, I have to lay proper foundation.
>
> His statement was, "I shot him." That was not brought in before the jury. So yes, if I bring in that statement, yes, I have to lay the foundation.
>
> I didn't ask him that. I simply asked him have you ever lied under oath.
>
> And so, you know, obviously, now they want to split the hairs and say, well, you can only talk about this, you can only talk about that.
>
> They need to know, in terms of motive, interest or bias, that when he said that he was doing it for Maryann [ ], that's just another one of his outright lies because he's there asking for parole at this point. And when he tells something like that, it is damaging his opportunity for parole and it's not helping hers because they are not even considering her for parole.

If the door is open, the door is open, that's fine.

The circuit court stated: "To me, the door is open given what [William] has said. And I'm not criticizing anybody. The door is open. Once it's open, it's going to be completely open ... to the entire Cesario Arauza—not about the incident, certainly the convictions. Because [the jurors] are going to need to have a context by which to operate."

Based on its ruling, the circuit court admitted the California judgments against Maryann and William into evidence.[8] Although defense counsel objected to the circuit court's ruling regarding the Arauza conviction, it did not object to the admission of the California judgments. The circuit court then gave the jury the following limiting instruction:

> [Y]ou are about to hear evidence that the defendant and the witness at another time may have or have engaged in and committed other crimes, wrongs or acts. You must not use this evidence to determine that ... the defendant is a person of bad character and must have committed the offense charged in this case. Such evidence may be considered by you only on the issue of the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, modis [sic] operandi, absence of mistake or accident, and for no other purpose.
>
> So it doesn't go to propensity or character. It goes to the specific reasons detailed in our statute and the rules.

Defense counsel resumed the cross-examination of William. William testified that he turned himself in to authorities in California in connection with the Arauza incident, after Maryann was arrested in connection with

---

7. HRE Rule 106 (1993), commonly referred to as the rule of completeness, provides, "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."
 HRE Rule 611(a) (1993) provides:
 Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

8. Exhibit 39 was a copy of Maryann's judgment of conviction for the murder of Arauza and for the three robberies. Exhibit 40 was a copy of William's California conviction for the murder of Arauza, in which William was sentenced to a term of life imprisonment with the possibility of parole. The judgment further indicated that William was convicted of two robberies.

that incident.[9] William testified that he met with Deputy Sheriff Wilbert Ahn on July 3, 1978, and lied to Deputy Sheriff Ahn about particular details of the Arauza incident. William also testified that when he talks to the police "[he] usually [does not] give them proper—correct knowledge or correct information" in an effort to improve his legal situation.

William testified that when he turned himself in, there were no suspects in the Hasker and Leach incidents in Hawai'i. Maryann went to trial for Arauza's murder and in January 1979, was found guilty of the murder, but the court determined that the use of a firearm allegation was not true, and thus, the allegation was stricken.

William again contacted Deputy Sheriff Ahn on March 9, 1979, and told him that he wanted "to come clean" about what happened with Hasker and Leach. In addition, William told Deputy Sheriff Ahn that he wanted to prove that he did not shoot Arauza.

On May 9, 1979, William pleaded nolo contendere to the murder of Arauza and to using a firearm in the commission of the murder. William stated, "I wanted to accept my responsibility for the crimes that happened." William thought he pleaded guilty to felony murder, but acknowledged that the transcript of the proceeding indicated that he pleaded nolo contendere to the Arauza murder. William was sentenced to life with the possibility of parole for Arauza's murder.

In 1991, William appeared before the California Parole Board and stated under oath that he committed the murders of Arauza and Hasker and that Maryann did "[a]bsolutely nothing." In a 1994 hearing before the Board, William stated that he shot Arauza in self-defense. William, however, testified at Maryann's retrial that he lied to the Board in both instances. William stated that he lied because UCLA law students informed him that Maryann could be set free if he told the Board that he shot Arauza and Hasker. In 1997 and 2000 California Parole Board

hearings, William denied admitting in the prior Board hearings that he killed Hasker and Arauza.

On redirect examination, William indicated that Arauza gave him and Maryann a ride, that Maryann "drove off" with Arauza when they got to a restaurant, and that Maryann came back without Arauza. He acknowledged that he and Maryann were convicted of Arauza's murder, as evidenced by the California judgments. The following exchange then occurred:

[State]: Now, in those judgments, there were other robberies that occurred after [ ] Arauza's murder?

[Defense]: Objection, Your Honor. Ask to approach.

THE COURT: In those judgments? Why don't you approach briefly.

(The following proceedings had at the bench:)

THE COURT: We're talking about other robberies or the Arauza robbery?

. . . .

[Defense]: Judge, they're bringing up robberies that the Court already said that they can't bring up. I mean, this is—

THE COURT: Did you get into 'em? Did you open the door?

[State]: Yes, he did.

THE COURT: How?

[State]: He asked [William] what he pled guilty to.

[Defense]: I did not ask him that. I asked him did he plead nolo contendre to murder of [ ] Arauza.

THE COURT: Yeah.

[State]: The judgment's already in, Your Honor.

THE COURT: I understand. This is all new information, and I don't want a surprise here.

[Defense]: Judge, I don't think the judgments have the other charges on 'em.

. . . .

9. Sergeant Mark Aguirre, whose testimony from Maryann's initial trial was read into the record, testified that on June 28, 1978, he and his partner stopped Maryann, who was driving a 1974 Chevy Blazer, that was registered to Arauza.

Sergeant Aguirre and his partner subsequently went to Maryann's motel room and recovered a brown pouch that contained thirty-three .38 caliber revolver rounds.

[State]: We can look at the judgment, Your Honor.

THE COURT: Let me look at the judgment.

[Defense]: This is Maryann and this is William. THE COURT: As far as Maryann Acker's, does it show here? Got a bunch of 'em there.

[Defense]: I move to strike. I wasn't looking at that. I was looking at the first page when she was talking about—

THE COURT: They're separate robberies?

[State]: Maryann's charged with three, William's charged with two. The two that William is charged with are the same two that Maryann has. She also has a third.

THE COURT: Other than confuse the jury or dirty up both of them, what's the-where is this going to help—

[State]: Your Honor, this goes to the pattern and practice. This goes to the crime spree that they were engaged in. Your Honor, she's saying that she had no choice, that she—you know, that she was forced to do this, that she had no opportunity to get away, all those sort of things.

THE COURT: You were unaware of those others?

[Defense]: Yeah. I'm just saying I was unaware.

THE COURT: The objection's overruled. We're going to get into 'em.

[Defense]: What is he allowed to get into?

THE COURT: Pattern and practice.

[Defense]: So he's allowed to get into all these other robberies in California?

THE COURT: Yes.

[Defense]: Your Honor, at this point in time, I don't have discovery pertaining to that.

THE COURT: To me, it came in. It was cross-examined and the jury is entitled to know. So with that, let's keep going.

William testified that he and Maryann committed two robberies together in California and that she committed one additional robbery. But, William stated that he did not know, at that time, that Arauza had been killed. William stated that he found out that Maryann had been convicted of the Arauza murder when they were both on a bus together while incarcerated. William stated that Maryann told him, "Look, you idiot, haven't you snapped [ ] I shot him[.]" [10]

### ii. Deputy Sheriff Ahn's Testimony

Deputy Sheriff Ahn testified that he was assigned to investigate the Arauza murder. On March 9, 1979, William contacted Deputy Sheriff Ahn and talked to him about the Arauza homicide and criminal activity that occurred in Hawai'i. William told Deputy Sheriff Ahn that both he and Maryann robbed Leach and Hasker in Hawai'i. William also indicated that Maryann shot Hasker. Deputy Sheriff Ahn contacted HPD Detective Jimon You in Hawai'i to confirm the allegations. Detective You flew to California to interview Maryann and William, and brought with him "two expended .38 caliber bullets ... to compare with the bullets" found in Arauza. [11] Deputy Sheriff Ahn stated that he had official contact with William between 50 to 75 times, and acknowledged that William "was in [his] custody[.]"

### iii. Defense's Case

Maryann testified that in May of 1978, her then husband, William, "broke into a neighbor's apartment and stole" a .38 caliber re-

10. Dr. Eugene Carpenter, whose testimony from Maryann's initial trial was read into the record, testified that he performed an autopsy on Arauza on June 27, 1978, and determined that the cause of Arauza's death was two gunshot wounds to Arauza's head—one entry wound on the right forehead and one entry wound on the right cheek. Dr. Carpenter stated that Arauza was "shot at close range[.]" Two bullets were recovered from Arauza's head, which Dr. Carpenter placed in an envelope and turned over to the evidence custodian.

11. Sergeant Robert Christansen, whose testimony from Maryann's initial trial was also read into the record, identified the four bullets submitted by Deputy Sheriff Ahn and Detective You as ".38 Special caliber." Sergeant Christansen stated, "In my opinion, all four of the expended bullets were fired in one firearm."

volver. Maryann did not question William because she did not want to agitate him: "He wasn't always the easiest guy to talk to. He would get angry very quickly." In June of 1978, the couple came to Hawai'i. William brought the .38 caliber revolver with him. Maryann stated that William began talking about a plan to rob tourists:

[William] wanted [her] to be a lure basically and go into bars, try and meet guys, see who lived here, who was a tourist, and see if I could get them interested in me. And then he would come up, introduce himself either as my brother or brother-in-law, suggest that we go someplace else, and ask for a ride. And during that point he would rob the individual.

Maryann did not want to participate, but she eventually agreed to do so because William started threatening her: "He would hold the gun to my head or my ribs and tell me I would do what he said." Maryann never did anything about the situation because she was fearful, did not know how to deal with the situation, and did not have the courage or strength to deal with William. At one point, William aimed the gun toward Maryann and fired it, and the bullet "went into the doorjamb right beside [her] head."

The couple first executed the plan against Leach. While Maryann and Leach were talking at a bar, William introduced himself as Maryann's brother-in-law and requested a ride home. Leach subsequently gave William and Maryann a ride in his car. During the ride, William pulled a gun on Leach. William and Maryann then robbed Leach and left him at Hanauma Bay. A few days after the Leach incident, William "wanted to pull another robbery[.]" Maryann stated, "I didn't want to do it again. I kept trying to talk him into letting me go get a job. If he was insistent on staying here, I'll go get a job, let's do this the right way."

On June 19, 1978, while at a bar, Maryann met Hasker. Maryann discovered that Hasker lived in Hawai'i and was not a tourist. She tried to talk William out of the robbery, but William, who was carrying the gun, stated: "But he's talking about having money and drugs, and I want that." Maryann and William then told Hasker that they

were going to another bar, and then left. Maryann and William were at another bar when Hasker showed up. After a few drinks, William asked Hasker for a ride back to their apartment. Hasker drove William and Maryann to their apartment. Maryann tried talking William out of the robbery. But, William pulled the gun on Hasker, and told him that he was being robbed. Maryann then drove the three of them to Hasker's apartment, and went inside in search of "money and the drugs." Maryann felt that she was being forced to burglarize Hasker's apartment because "of William, his threats, my commitment to him, I guess. Eighteen years old and married to this guy and doing what my husband told me to do." Maryann took money from the apartment, but did not look for any drugs.

William became angry when Maryann returned without drugs, so he instructed her to return to Hasker's apartment and take Hasker's cocaine. Although Hasker explained to Maryann where the cocaine was, Maryann was unable to find it. William and Maryann then decided that they would take Hasker to Hanauma Bay. When they arrived at Hanauma Bay, William told Maryann to pull over to the side of the road, and he instructed Hasker to get out of the car. William, who was holding a gun, and Hasker exited the car and walked down the embankment "out of [Maryann's] line of sight." Maryann then heard two gunshots. William returned to the car and got into the driver's seat. When Maryann asked William what happened, he responded, "Nah, don't worry about it. It's just something I had to do. You wouldn't understand." Later that day, William made flight reservations for himself and Maryann to return to Los Angeles.

While in California, William and Maryann were hitchhiking and were picked up by Arauza. During the ride, William pulled the gun on Arauza and instructed him to pull over to the side of the road. William and Arauza exited the vehicle and walked down an embankment on the side of the highway "[o]ut of [Maryann's] line of vision." A few minutes later, Maryann heard two gunshots. William returned to Arauza's car. When Maryann asked what happened, William stat-

ed that "it was just something he had to do and [she] wouldn't understand." They drove Arauza's car to Los Angeles, where Maryann and William participated in other robberies.

Maryann was subsequently arrested while driving Arauza's vehicle and charged with various robberies that she and William committed, as well as the murder of Arauza. While imprisoned, Maryann wrote William "love" letters because when he was arrested, he told her that "he was going to tell the truth, tell them what happened, and tell them that I didn't kill anybody, that he did, that he killed [ ] Arauza."

Maryann also stated that, contrary to William's testimony, she was never represented by "UCLA" law students. She was, however, represented by "USC" students in 1995, which was after William testified to the California Parole Board in 1991 and 1994 that he shot Hasker and Arauza.

On cross-examination, Maryann could not recall whether William had asked to move in with her two weeks after they met. The State then provided Maryann with a statement that she made in a confidential Presentence Diagnosis and Report (Presentence Report) from her initial trial. Maryann objected to the use of the Presentence Report because such confidential reports cannot be used to impeach the defendant. The circuit court overruled the objection. After reviewing her Presentence Report, Maryann was asked whether William asked to move in with her two weeks after they met, whether she was initially reluctant, and whether she eventually agreed to William moving in. Maryann responded affirmatively to the inquiries.

Maryann also testified that she was involved in a total of three robberies. Maryann testified that the first robbery occurred in Los Angeles, and that she stood inside the door of a store as the lookout, while William robbed the store. The State asked whether Maryann had thought to "dash" into a neighboring store to tell them, "There's a man committing a robbery," to which Maryann responded, "I didn't think to do that, no." The State continued:

[State:] And then the next one is you by yourself.

[Maryann:] Yes, I did.

[State:] Isn't that right? You had the gun?

[Maryann:] I had the gun.

[State:] You went inside the store?

[Maryann:] I did. He had tried to get into the store, and the woman that was working wouldn't let him in, and so he sent me in. And I went in. And again, I see another opportunity where I should have and wish I had told the woman lock the door, call the police. And I did not.

[State:] Instead you put your purse down on the counter; right?

[Maryann:] Yes.

[State:] You pulled out the gun?

[Maryann:] Yes.

[State:] And you instructed that woman, Just put all of the money in the purse?

[Maryann:] Yes.

[State:] I won't hesitate to shoot? You told her that; right?

[Maryann:] (Witness nodded.)

[State:] I won't hesitate to shoot? Those are your words. Right?

[Maryann:] Probably.

[State:] William's not in there next to you; right?

[Maryann:] No.

[State:] You have the gun at this point; right?

[Maryann:] Yes. And I was still doing what he told me to do.

[State:] No. I understand that. But you're in there with the gun?

[Maryann:] Yes.

[State:] And he's outside?

[Maryann:] Yes.

[State:] How far away?

[Maryann:] I'm not sure exactly where he was. [State:] Could he see you?

[Maryann:] I don't recall where he was. I don't know.

[State:] So there was nothing stopping you then from just telling the clerk, Look, my husband's outside, he wants me to rob you, call the police?

[Maryann:] And I realized later that that was the perfect opportunity. At that moment I did not. I was operating under what he told me to do. I know now there were so many times that there were things I could have done. I made the wrong choices. I admit that. I robbed that woman. I admit that. And I admit that I know it was the wrong choice to do. I knew the difference between a right and wrong, and I did it anyway.

Maryann also confirmed that she later committed another robbery with William.

Outside of the presence of the jury, Maryann stated that she would be recalling William to testify as to why he met with Deputy Sheriff Ahn 50 to 75 times, and to further inquire about William's testimony that he met with "law students from UCLA" who told him to take responsibility for the murders of Arauza and Hasker so that Maryann could be released from prison. The circuit court agreed to allow her to do so. Pursuant to a subpoena, William was transferred to the courthouse and held in the cellblock. Subsequently, Deputy Sheriff Thomas Cayetano was called to testify outside the presence of the jury, and stated that William knew that he was subpoenaed to testify, but informed Deputy Sheriff Cayetano that he "did not want" to testify because of concern for his safety. On cross-examination, Deputy Sheriff Cayetano specified that William was informed that the nature of his testimony would be in regard to the "cooperation or testimony he's given in other cases on the mainland[.]" Deputy Sheriff Cayetano stated that William expressed concern for his safety in relation to testifying regarding his informant activities.

Deputy Sheriff Cayetano acknowledged that there was an "extraction" process, by which the sheriffs could remove a reluctant witness from his or her cell and bring him or her to the courtroom. Deputy Sheriff Cayetano testified that it would take between one to two hours to complete the extraction process, during which time various command personnel would be notified, a team of officers would be assembled, equipment would be distributed, and an "operational plan" would be formulated. Maryann requested that the circuit court extract William from his cell.

The circuit court recognized Maryann's right to compulsory process, but decided against extracting William because it concluded that "in the interest of justice" and out of "fairness to both sides" that would not be helpful. Specifically, the circuit court noted that extracting William "wouldn't work and wouldn't be helpful for the jury."

Although the State argued that the jury should not even be informed of William's refusal to testify, the circuit court allowed Maryann to call Deputy Sheriff Cayetano as a witness, stating that it did so out of a concern for fairness and in order to avoid any juror confusion.

Deputy Sheriff Cayetano testified before the jury that William was transferred to the courthouse to testify as a witness, but refused to testify.

#### iv. Jury Instructions

As relevant to this appeal, the State requested that the following instruction be given on murder (State's Instruction No. 1):

A person commits the offense of Murder if she intentionally or knowingly causes the death of another person.

There are two material elements of the offense of Murder, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That on or about the 18th day of June 1978, through and including the 20th day of June 1978, in the City and County of Honolulu, the Defendant intentionally or knowingly engaged in conduct; and

2. That by engaging in that conduct, the Defendant intentionally or knowingly caused the death of [ ] Hasker.

The State also proposed the following instruction on accomplice liability (State's Instruction No. 2):

A defendant charged with committing an offense may be guilty because she is an accomplice of another person in the com-

mission of the offense. The prosecution must prove accomplice liability beyond a reasonable doubt.

A person is an accomplice of another in the commission of an offense if, with the intent to promote or facilitate the commission of the offense, she

a. Solicits the other person to commit it; or

b. Aids or agrees or attempts to aid the other person in the planning or commission of the offense.

Mere presence at the scene of an offense, or knowledge that an offense is being committed, without more, does not make a person an accomplice to the offense. However, if a person plans or participates in the commission of an offense with the intent to promote or facilitate the offense, she is an accomplice to the commission of the offense.

Maryann objected to the murder instruction:

I would only point to Count [VI] of the indictment itself, which specifically states Maryann [ ] did intentionally or knowingly cause the death of [ ] Hasker by shooting him with a firearm, thereby committing the offense of murder. And they specifically charged her with shooting him. And I believe that that's like a bill of particulars. It's not surplusage. The indictment cannot be modified or amended and, therefore, they are limited to proving that. . . . But that's why I'm objecting to State's Instruction No. 1, because it does not include the language that they need to prove that she shot and killed [ ] Hasker.

(Emphasis added).

Maryann appeared to object to the accomplice liability instruction on the same ground. Over Maryann's objection, the circuit court gave the State's Instruction No. 1, and the following modification of State's Instruction No. 2:

A defendant charged with committing the offense of Murder may be guilty because she is an accomplice of another person in the commission of that offense. The prosecution must prove accomplice liability beyond a reasonable doubt.

A person is an accomplice of another in the commission of the offense of Murder if, with the intent to promote or facilitate the commission of that offense, she

a. solicits the other person to commit it; or

b. aids or agrees or attempts to aid the other person in the planning or commission of that offense.

Mere presence at the scene of an offense, or knowledge that an offense is being committed, without more, does not make a person an accomplice to that offense. However, if a person plans or participates in the commission of that offense with the intent to promote or facilitate that offense, she is an accomplice to the commission of that offense.

(Emphases added).

### v. Closing Arguments, Verdict, and Sentence

The State argued that William was a credible witness and that Maryann had shot Hasker. The State further emphasized that Maryann had numerous opportunities to report William's criminal conduct, but never did. The State also argued that Maryann lied multiple times during the investigation and that her testimony was not credible.

Defense counsel attacked William's credibility by referring multiple times to his inconsistent statements under oath regarding Maryann's involvement in the murders of Hasker and Arauza. For example, defense counsel argued, "William [ ] admitted that he committed perjury against Maryann. William admitted under oath that he shot and killed [ ] Hasker and [ ] Arauza. And he did it more than once." With regard to the Arauza murder, defense counsel also stated, "William [ ] was facing a murder charge. The Court found that Maryann did not shoot [ ] Arauza. The only logical legal conclusion was that William shot and killed Arauza. . . . And the truth is that Maryann was found not to have shot and killed Arauza."

In its rebuttal closing, the State again emphasized the credibility of the witnesses. Relevant to this appeal, the State asserted:

[Defense counsel] wants you to believe that at the time William [ ] gave his first statement to Detective Ahn regarding the Hawaii and the California incidents saying that Maryann was the shooter, he was trying to save himself. [Defense counsel] says that [William] knew that she had been convicted. [William] knew that the use allegation was found untrue, and therefore, he must be the shooter.

Well, think back to the testimony, ladies and gentlemen. And you recall, when William [ ] was shown Maryann['s] judgment on the stand, that was the first time he had ever seen it. He did not know that she had her use allegation stricken. He only knew she had been convicted of murder. And recall, the conviction happened in January. William [ ] didn't say anything to Wilbert Ahn until March, after he had that meeting with [Maryann] on the bus from court, where she said, "Have you snapped? I killed Cesario Arauza."

And at that point, he just gave up, ladies and gentlemen. He pled nolo contendere, no contest. It's not an admission, but the Court did find him guilty of everything charged. There was no trial, no admission, but he just gave up. He didn't ask for anything. He didn't get anything. He's still in custody today.

Maryann then objected:

It's improper. We weren't allowed to present the testimony of William that he made all these deals on the side and he was trying to get something out of it. So, I mean, he's saying that he didn't get anything out of it. He didn't have any other ulterior motive. That's not true. We couldn't present that evidence because he refused to testify.

The State then responded, "There's no evidence of that[.]" The circuit court overruled the objection and denied Maryann's subsequent motion for a mistrial.

The jury found Maryann guilty of murder. The jury was given a special interrogatory: "Did the prosecution prove beyond a reasonable doubt that [Maryann] actually possessed, used, or threatened to use a pistol during the commission of the Murder or Manslaughter?" The jury answered, "No."

The circuit court subsequently entered its Judgment of Conviction and Sentence, convicting Maryann of murder and sentencing her to life in prison with the possibility of parole. Maryann timely appealed.

## 2. ICA Appeal

In its Memorandum Opinion, the ICA affirmed Maryann's conviction, and concluded that: (1) Maryann opened the door to the California incidents, and the circuit court did not abuse its discretion in permitting the challenged evidence; (2) the circuit court did not abuse it discretion denying Maryann's motion for a mistrial because of Millard's testimony regarding the lie detector test; (3) the State's use of Maryann's presentence report did not result in any significant prejudice to Maryann and did not affect her substantial rights; (4) the manner in which the circuit court dealt with William's refusal to be recalled as a witness in Maryann's case did not deprive Maryann of a fair trial; (5) the deputy prosecuting attorney (DPA) did not engage in prosecutorial misconduct for his statements during rebuttal closing; and (6) the circuit court's jury instructions on murder and accomplice liability were not erroneous. *State v. Acker*, No. 30205, 128 Hawai'i 497, 2012 WL 4857018, **1–17 (Haw.App. Oct. 12, 2012) (Mem. Op.).

## II. Standards of Review

### A. Right to a Fair Trial

■ "A fair trial by an impartial jury is guaranteed to the criminally accused by both the sixth amendment of the United States Constitution and article I, § 14 of the Hawai'i Constitution." *State v. Furutani*, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994) (citation and brackets omitted). "This court reviews questions of constitutional law de novo, under the right/wrong standard and, thus, exercises its own independent constitutional judgment based on the facts of the case." *State v. Mattson*, 122 Hawai'i 312, 321, 226 P.3d 482, 491 (2010) (citation, brackets, and internal quotation marks omitted).

### B. Evidentiary Rulings

█ The appellate court applies "two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (internal quotation marks and citations omitted).

### C. Prior Bad Acts Evidence

█ "Prior bad act" evidence under [HRE] Rule 404(b) . . . is admissible when it is 1) relevant and 2) more probative than prejudicial. A trial court's determination that evidence is "relevant" within the meaning of HRE Rule 401 . . . is reviewed under the right/wrong standard of review. However, a trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 . . . is reviewed for abuse of discretion. An abuse of discretion occurs when the court clearly exceeds the bounds of reason or disregards rules or principles of law to the substantial detriment of a party litigant.

*State v. Behrendt*, 124 Hawai'i 90, 102, 237 P.3d 1156, 1168 (2010) (brackets and ellipses in original) (citation omitted).

### D. Prosecutorial Misconduct

█ "Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. Rogan*, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (internal quotation marks and citations omitted) (quoting *State v. Sawyer*, 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998)).

█ "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff*, 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994).

"In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the appellate court considers] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." *State v. Agrabante*, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992) (citation omitted).

### E. Jury Instructions

█ When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

*State v. Arceo*, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (internal quotation marks, brackets, and citations omitted); *see also State v. Nichols*, 111 Hawai'i 327, 337, 141 P.3d 974, 984 (2006) ("[O]nce instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt.").

### F. Motion for Mistrial

█ The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion. The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

*State v. Lagat*, 97 Hawai'i 492, 495, 40 P.3d 894, 897 (2002) (internal quotation marks and citations omitted).

### III. Discussion

Maryann argues that she was denied a fair trial because: (1) the circuit court erred in admitting the prior "bad acts" evidence, i.e.,

the Arauza incident and California robberies; (2) the circuit court erred in denying a mistrial when Millard testified that the police officers administered a polygraph test on him and that he passed the test, implying that William also passed a polygraph test; (3) the prosecutor engaged in misconduct when he cross-examined Maryann using her confidential Presentence Report and bolstered William's credibility during his rebuttal closing; (4) the circuit court erred in refusing to extract William; and (5) the jury instructions on accomplice liability and the offense of murder were erroneous.

## A. Evidence of the Arauza incident and California robberies was admissible

### 1. The circuit court erred in determining that Maryann opened the door to evidence of the Arauza incident

■ Maryann argues that the door was not opened to the Arauza incident by defense counsel's cross-examination of William regarding whether he lied under oath as it pertained to Maryann. First, Maryann argues that "[t]he trial court indicated that Maryann could 'cross' William about what he told the Paroling Authority and his wanting to exculpate Maryann. The trial court indicated that it would decide the scope beyond that." Maryann also appears to argue that in any event, defense counsel had not questioned William about the facts of his testimony to the California Parole Board at the time the circuit court determined he opened the door.

The record shows that defense counsel did not open the door to the Arauza incident and California robberies. At a pre-trial hearing on July 24, 2009, the circuit court, which was aware that William had exculpated Maryann in testimony to the California Parole Board, determined that defense counsel could "cross [William] based upon what he told the Paroling Authority." In addition, the circuit court stated: "I'll decide at the time the scope beyond that."

In its Order granting in part and denying in part Maryann's Third Motion in Limine, the circuit court ordered that "should [Maryann] question William [ ] on his 1991 state-ment to the California Parole Board, the State may then introduce evidence of William['s] reasons for making that statement, including [Maryann's] conviction and sentence for the murder of [ ] Arauza in California." (Emphasis added).

That same day, defense counsel cross-examined William, and began with the question: "[Did] you ever lie under oath, commit perjury as it pertains to Maryann?" William responded, "Yeah," the State objected and argued that the question had opened the door to the Arauza incident. The circuit court overruled the objection and allowed defense counsel to proceed. Defense counsel asked: "[H]ave you ever lied under oath as it pertain[ed] to Maryann?" William then asked the circuit court, "does a board hearing count[,]" to which the circuit court responded, "If it's under oath, yes. I don't know what the board—I assume we are talking about a California board hearing; is that right?" After a bench conference, the circuit court struck the "last whole series of questions about perjury and the answers[.]" Defense counsel then questioned William about statements he had made regarding prior cocaine use. William stated that he lied about his cocaine use so that he could go to a rehabilitation center as opposed to prison. William then stated that he would lie to get himself out of prison, but he would not lie under oath.

Defense counsel then requested that he be able to question William as to whether he ever lied under oath: "He just said he wouldn't lie under oath.... I'm going to ask him if he ever did that." The circuit court then stated, "I will allow that particular question, but I want you to know you got your hand on that doorknob." The following exchange then occurred:

[Defense]: My question then is to you, [William], have you ever lied under oath as it pertains to anything about Maryann?

[William]: Probably.

[Defense]: Probably. Does that mean yes?

[William]: Yeah, that means yes.

[Defense]: Okay.

[William]: But not in court.

[Defense]: And so when you lie—I'm sorry. When you lied under oath about Maryann, was there any repercussion to you?

[William]: No.

[Defense]: No.

[William]: No, there wasn't because there wasn't a lie on her. I'm trying to do something for her.

The circuit court ruled that defense counsel had opened the door. Defense counsel objected to that ruling, but said he would proceed based on the circuit court's ruling.

Under the circuit court's July 24, 2009 oral ruling, defense counsel was expressly allowed to cross-examine William on "what he told the Paroling Authority." Specifically, pursuant to the circuit court's August 18, 2009 Order, defense counsel would open the door only if he questioned William about his "statement" to the California Parole Board. Clearly, up until the point where the circuit court ruled that defense counsel had opened the door, defense counsel did not ask William what his "statement" was to the California Parole Board. Defense counsel merely asked William if he had ever lied under oath as it pertained to Maryann, and if there were any repercussions for that lie.

When viewed in context, defense counsel limited his line of questioning to elicit a response from William as to whether he lied under oath as it pertained to Maryann and if there were any repercussions to him. Defense counsel did not ask about specific facts regarding the Arauza incident, or about the details of William's testimony to the California Parole Board. Therefore, defense counsel's questioning was consistent with the circuit court's oral rulings and written order

granting in part and denying in part Maryann's Third Motion in Limine.

Accordingly, defense counsel had not yet opened the door to the Arauza incident. Furthermore, in ruling that defense counsel opened the door, the circuit court appears to have made conflicting determinations as to what questions defense counsel was allowed to pursue on cross-examination without opening the door.[12]

Thus, contrary to the ICA's position, the door was not opened to the Arauza convictions and the California evidence when defense counsel asked whether William lied under oath as it pertained to Maryann and whether there were any repercussions for that lie. Accordingly, the circuit court erred in allowing the testimony of the Arauza incident based on its determination that defense counsel had opened the door.

2. **The circuit court's error was harmless because the evidence of the Arauza incident and California robberies was admissible under HRE Rule 404(b) to show intent and a common plan, and to rebut Maryann's assertion that she was coerced**

 Although the circuit court erred in determining that defense counsel opened the door to the Arauza incident and California robberies, that error was harmless because the evidence was admissible under HRE Rule 404(b).[13] Maryann argues that the evidence involving the Arauza incident was irrelevant and inadmissible under HRE Rule 404(b), as it "served to prove bad character[.]" However, as explained below, the Arauza incident and California robberies were admissible for other proper purposes.

HRE Rule 404(b) provides:

the circuit court revisited this prior determination and, in its December 29, 2008 Findings of Fact, Conclusions of Law, and Order Granting in Part and Denying in Part State's Notice of Intent to Use Evidence, concluded that regardless of the doctrine of "law of the case" there were cogent reasons to preclude use of this evidence. As explained infra, this determination was incorrect and we therefore reaffirm our prior ruling regarding admissibility of this evidence.

---

12. Moreover, in both its August 18, 2009 Order and its oral ruling, the circuit court indicated that only the Arauza <u>convictions</u> would be allowed into evidence. The circuit court, however, disregarded its own limitation on the evidence and allowed evidence of the <u>facts</u> of the Arauza incident.

13. At Maryann's initial trial, the circuit court allowed evidence of the Arauza incident. That determination, which was initially challenged on appeal, was affirmed by this court. At retrial,

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

The purpose of HRE Rule 404(b) is to prohibit the admission of evidence "that a party possesses a criminal character and acted in conformity therewith." *State v. Yamada*, 116 Hawai'i 422, 434, 173 P.3d 569, 581 (App.2007). In addition,

Although such evidence may never be used solely for the purpose of suggesting criminal propensity, under certain circumstances it may be offered to prove other facts of consequence. Such facts include, but are not limited to, motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

*Id.* at 435, 173 P.3d at 582 (citations and quotation marks omitted).

Furthermore, under HRE Rule 404(b), "any purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character." *Id.* (citation and emphases omitted). In addition, the evidence must be more probative than prejudicial. *Behrendt*, 124 Hawai'i at 102, 237 P.3d at 1168. This court has stated:

When weighing probative value versus prejudicial effect in this context, a court must consider a variety of factors, includ-

ing ... the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*Id.* at 106, 237 P.3d at 1172.

Evidence of the Arauza incident was relevant to show intent and common plan because the Arauza, Hasker and Leach incidents involved similar scenarios, i.e., Maryann and William robbed lone men, left them at remote locations, and escaped in their victims' vehicles. By so doing, they were able to minimize their chances of being caught.

The Arauza incident and California robberies were also relevant to refute Maryann's theory that William orchestrated and forced her to participate in the criminal activity, and to show that Maryann was an intentional and willing participant in Hasker's murder and not merely a pawn in William's conduct. In Maryann's opening statement, defense counsel argued that William was an "infection" that had struck fear into Maryann by shooting at her to force her to participate in his plan to commit robberies. Defense counsel argued that William pressured and forced Maryann to go along with William's plan. Defense counsel also asserted that Maryann did not shoot Hasker, did not intend for Hasker to die, and did not know that William would shoot Hasker.

The evidence of the California incidents was relevant to rebut Maryann's theory of coercion. It showed that she had the opportunity on the mainland—after Maryann and William returned there from Hawai'i—to disassociate herself from William's control.[14]

Moreover, the probative value of the Arauza incident and California robberies outweighs the prejudicial effect against Maryann. Several factors weigh in favor of admission of the evidence. The evidence was

---

14. With regard to the California robberies, defense counsel did not object to the admission of Maryann's California judgment, which included the robbery convictions. Defense counsel appeared to suggest subsequently that he did not realize that the robberies were included on the judgment.

strong insomuch as it was undisputed that the California incidents occurred and that, at the very least, Maryann was present during each of the incidents. The time that elapsed between the crimes was relatively brief: Hasker was murdered "[o]n or about" June 18, 1978 through June 20, 1978, Arauza was murdered on June 24, 1978, and the California robberies occurred on June 25, 26, and 28, 1978. *See United States v. Basham*, 561 F.3d 302, 326–28 (4th Cir.2009) (holding that evidence of other acts during a sixteen-day crime spree was more probative than prejudicial). There was a strong need for the evidence, since the pattern of conduct helped to rebut Maryann's suggestion that she had been coerced into participating in Hasker's killing. All of the incidents involved armed robberies, and there were strong factual similarities between the Hasker and Arauza incidents. Although the Arauza incident began somewhat differently than the Hasker incident (with Maryann and William hitchhiking, rather than Maryann getting "dolled up" and meeting their victim at a bar), once they were alone with Arauza the incidents were similar. Lastly, the evidence of the California incidents was not likely to rouse the jury to an overmastering sense of hostility against Maryann because the conduct (murder and robbery) was the same type of conduct that was committed in Hawai'i.

In sum, the California incidents were more probative than prejudicial. Thus, evidence of the Arauza incident and the California robberies was admissible under HRE Rule 404(b).

Additionally, through William's testimony regarding the Arauza incident and the California robberies, Maryann was able to mount a strong attack on William's credibility. On cross-examination, defense counsel was able to elicit the following testimony from William: (1) he acknowledged that he would lie in order to obtain favorable treatment; (2) he stated that he would lie under oath and that he lies to police and prosecutors; (3) he testified that he reported the Hasker murder to divert suspicion away from him in the Arauza incident and that when he talks to police it is usually to improve his legal situation; (4) he stated that he lied to Deputy Sheriff Ahn about details regarding the Arauza incident; and (5) he stated that there was no objective way to judge if he was telling the truth, and that he was a convict and convicts do not tell truth.

Furthermore, Maryann used the evidence of the Arauza incident and both Maryann's and William's convictions for the incident to argue during closing argument that William shot Arauza (and therefore, also shot Hasker), and Maryann did not.

Finally, the jury was given the following limiting instruction regarding the California convictions:

> [Y]ou are about to hear evidence that the defendant and the witness at another time may have or have engaged in and committed other crimes, wrongs or acts. You must not use this evidence to determine that the defendant or the witness are persons of bad character and, therefore, must have committed the offense charged in this case.
>
> Actually, I'm talking only about [Maryann], the defendant is a person of bad character and must have committed the offense charged in this case. Such evidence may be considered by you only on the issue of the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, modis [sic] operandi, absence of mistake or accident, and for no other purpose.
>
> So it doesn't go to propensity or character. It goes to the specific reasons detailed in our statute and the rules.

 This limiting instruction dissipated the risk of prejudice to Maryann because a jury is presumed to follow the instructions it is given by the court. *See State v. Knight*, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996) ("[A]s a rule, juries are presumed to ... follow all of the trial court's instructions.").

Thus, although the circuit court erred in its determination that defense counsel had opened the door to the Arauza incident and California robberies, the error was harmless because that evidence was nevertheless admissible under HRE Rule 404(b).

**B. The circuit court did not abuse its discretion in denying Maryann's motion for a mistrial because it struck Millard's testimony regarding the lie detector test and instructed the jury to disregard it**

■■ Maryann contends that Millard's testimony that he took a lie detector test after being questioned by police regarding the night of Hasker's murder and passed that test "generated insurmountable prejudice[.]" Citing *State v. Kahinu*, 53 Haw. 536, 498 P.2d 635 (1972), Maryann asserts that Millard's testimony was an "evidentiary harpoon" because the jury could infer from Millard's testimony that the police also administered a lie detector test to William and that William passed. Maryann's argument is without merit.

In *Kahinu*, the defendant, Robert Edson Kahinu, was convicted of burglary in the first degree and assault with the intent to rape. *Id.* at 537, 498 P.2d at 637. During Kahinu's trial, Detective Rivera testified that Kahinu was in police custody on another case at the time he interviewed the complaining witness about her photographic identification of Kahinu. *Id.* at 548, 498 P.2d at 643. Defense counsel objected to the testimony, but the circuit court overruled the objection. *Id.* The circuit court, however, struck any testimony regarding other cases from the record. *Id.* Kahinu was subsequently found guilty. *Id.* at 537, 498 P.2d at 637. This court stated, "the deliberate and unresponsive injection by prosecution witnesses of irrelevant references to prior arrests, convictions, or imprisonment may generate insurmountable prejudice to the cause of an accused." *Id.* at 549, 498 P.2d at 643 (citation omitted). This court stated that Detective Rivera's testimony could constitute an "evidential harpoon" requiring a mistrial. *Id.*

In this case, Millard's testimony was not an "evidential harpoon." Millard testified that he and Hasker planned to meet on the evening of June 19, 1978, at the Garden Bar at the Hilton Hawaiian Village. Millard, however, did not show for the meeting. A few days later, Millard was questioned by police: "They asked me if I would take a lie detector test, asked me a lot of questions like where

were you and this and all that. And apparently, you know, I answered all the questions and everything to their liking." Maryann objected to Millard's testimony, and at her request, the circuit court struck Millard's testimony regarding the lie detector test: "the Court has struck from the record the testimony about the polygraph test as irrelevant and inadmissible. And the jury will disregard and also not speculate on any other police activity. It's just not going to be part of this case, nor any case."

First, because the jury is presumed to follow the court's instructions, *see Knight*, 80 Hawai'i at 327, 909 P.2d at 1142, it cannot be said that Maryann was prejudiced. Second, it is not clear from the record that the jury would have necessarily inferred that William also took and passed a lie detector test. Accordingly, the circuit court did not abuse its discretion in concluding that striking Millard's testimony and directing the jury to disregard it was sufficient to protect Maryann's right to a fair trial.

**C. The DPA's use of the Presentence Report to question Maryann during cross-examination was harmless beyond a reasonable doubt and the DPA's comments during his rebuttal closing argument did not violate Maryann's right to a fair trial**

■■ First, citing *State v. Greyson*, 70 Haw. 227, 768 P.2d 759 (1989), Maryann argues that the State improperly cross-examined her using information contained in her Presentence Report. Maryann raised the same argument before the ICA. The ICA concluded that the DPA's use of the Presentence Report was improper under *Greyson*, but held that the error was harmless because it did not result in any substantial prejudice to Maryann or affect her substantial rights. *Acker*, 2012 WL 4857018, at *15.

Although Maryann argues that *Greyson* was applicable, she does not challenge the ICA's determination that the error was harmless. HRAP Rule 40.1(d)(4) ("The application for a writ of certiorari ... shall contain [a] brief argument with supporting authorities."). Thus, Maryann's argument is not discussed further. *See State v. Metcalfe*,

280

129 Hawai'i 206, 221 n. 8, 297 P.3d 1062, 1077 n. 8 (2013) (noting that an issue not raised in an application need not be discussed).

■■■ Second, Maryann contends that the DPA falsely and misleadingly "argued that William didn't ask for anything and didn't get anything as part of its attempt to bolster William's credibility." This argument also is without merit.

During rebuttal closing argument, the DPA stated:

> [W]hen William [ ] was shown Maryann['s] judgment on the stand, that was the first time he had ever seen it. He did not know that she had her use allegation stricken. He only knew she had been convicted of murder. And recall, the conviction happened in January. William [ ] didn't say anything to Wilbert Ahn until March, after he had that meeting with [Maryann] on the bus from court, where she said, "Have you snapped? I killed Cesario Arauza."
>
> And at that point, he just gave up, ladies and gentlemen. He pled nolo contendere, no contest. It's not an admission, but the Court did find him guilty of everything charged. There was no trial, no admission, but he just gave up. He didn't ask for anything. He didn't get anything. He's still in custody today.

The DPA's comments did not constitute misconduct, but rather permissible comment on the evidence. *See Rogan*, 91 Hawai'i at 412, 984 P.2d at 1238 ("It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence." (citations omitted)). Here, the DPA's statement during rebuttal closing argument referred to William's plea to the California charges. William's California judgment reflects that he pleaded nolo contendere to the two robbery charges and the murder of Arauza with the use of a firearm. William also acknowledged that he pleaded nolo contendere to Arauza's murder and the use of a firearm allegation. The judgment does not indicate that he received any deal in exchange for his plea. Thus, there was a basis in the evidence for the DPA's argument and the DPA's comments were permissible "comment[s] on the

evidence[.]" *Id.; see also State v. Clark*, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996).

Although Maryann argues that there was evidence to show that William was making "all these deals on the side[,]" that William received preferential treatment, and that William's refusal to testify in her case precluded her from bringing in that evidence, there is nothing in the record to indicate that William asked for or was given "anything" for his plea of nolo contendere on the California charges. Maryann had ample opportunity to cross-examine William on any agreements he made regarding the California incidents, but did not. All that is in the record is William's plea and his testimony, from which the DPA could draw reasonable inferences. *See Rogan*, 91 Hawai'i at 412, 984 P.2d at 1238; *Clark*, 83 Hawai'i at 304, 926 P.2d at 209.

Moreover, Maryann adduced significant evidence to show that William received a substantial benefit in his plea agreement regarding the Hawai'i charges, specifically, that all charges were dropped against him, except the robbery count, for his testimony against Maryann. Defense counsel also argued during closing argument that William continued to lie when he testified in Maryann's retrial regarding the Hasker murder in order to maintain his immunity from the remaining Hawai'i charges that were dismissed under his plea agreement with the State.

■■■ The DPA's alleged misconduct occurred during rebuttal closing, where the prosecution is given "wide latitude" to discuss the evidence. *See State v. Mars*, 116 Hawai'i 125, 142, 170 P.3d 861, 878 (App. 2007) ("Prosecutors have latitude to respond in rebuttal closing to arguments raised by defense counsel in their closing. The prosecution may base its closing argument on the evidence presented or reasonable inferences therefrom, respond to comments by defense counsel which invite or provoke response, denounce the activities of defendant and highlight inconsistencies in defendant's argument." (internal citation and quotation marks omitted)); *Clark*, 83 Hawai'i at 304, 926 P.2d at 209. The DPA's comments during rebuttal closing were in direct response to defense

counsel's statements during Maryann's closing argument. Specifically, defense counsel argued in closing that at the time William gave his statement to Deputy Sheriff Ahn, William was trying to convince Deputy Sheriff Ahn that he was not the shooter:

> William [ ] was facing a murder charge. The Court found that Maryann did not shoot [ ] Arauza. The only logical legal conclusion was that William shot and killed Arauza. Feeling desperate, William called Ahn to try to convince him that William was not the shooter.
>
> Now, William thought they wouldn't believe him because of his criminal history, but he tried, anyway. Maryann shot Arauza, even though a judge has already said that was not true. Oh, and to prove to you that she did it, she also shot a guy in Hawaii.
>
> Now, all of his scheming, all of his statements did not convince California that he did not shoot and kill Arauza, because you know what? At that point, William was right. They didn't believe him. California refused to drop the use-of-a-firearm allegation, so William pled nolo contendere, and the Court found that he shot and killed Arauza. He voluntarily did that. Nobody forced him. He said he understood everything that was going on, and he went in and he said nolo contendere.

Defense counsel thus portrayed William's reporting of the Arauza murder to Deputy Sheriff Ahn as an effort by William to deflect blame for the Arauza murder from himself to Maryann. However, the DPA argued in rebuttal closing that the evidence showed that William pleaded no contest to the Arauza murder because he knew that Maryann had been convicted, and because Maryann had told him on the bus that she shot Arauza. When viewed in context, the DPA's comments with regard to the nolo contendere plea, i.e., that "[William] didn't ask for anything[,] ... [h]e didn't get anything[,]" appear to have been in response to defense counsel's suggestion during Maryann's closing argument that William was trying to deflect the blame of the murder from himself to Maryann, and had a reasonable basis in the evidence. Again, the prosecution is given

"wide latitude" during rebuttal closing to respond to comments by defense counsel. *See Mars*, 116 Hawai'i at 142, 170 P.3d at 878; *Clark*, 83 Hawai'i at 304, 926 P.2d at 209.

Accordingly, the DPA did not mislead the jury and did not engage in prosecutorial misconduct.

**D. The circuit court did not abuse its discretion in denying Maryann's request to have William extracted from the courthouse cellblock**

■ Maryann argues that she had a right to compulsory process and to present a defense, and that she was denied a fair trial by the circuit court's denial of her request to have William extracted from the courthouse cellblock. On the facts of this case, we conclude that the circuit court did not abuse its discretion in denying Maryann's request to have William extracted from his cell.

■ "The due process guarantee of the Federal and Hawaii constitutions serves to protect the right of an accused in a criminal case to a fundamentally fair trial." *State v. Matafeo*, 71 Haw. 183, 185, 787 P.2d 671, 672 (1990) (citing *State v. Keliiholokai*, 58 Haw. 356, 569 P.2d 891 (1977)). As relevant here, a "fundamental element of due process of law is the right of compulsory process." *State v. Diaz*, 100 Hawai'i 210, 226, 58 P.3d 1257, 1273 (2002). "The right to compulsory process affords a defendant in all criminal prosecutions, not only the power to compel attendance of witnesses, but also the right to have those witnesses heard." *State v. Mitake*, 64 Haw. 217, 224, 638 P.2d 324, 329 (1981).

■ Although "the right to compulsory process is of paramount importance in assuring a defendant the right to a meaningful defense and a fair trial," it "does not guarantee the right to compel attendance and testimony of all potential witness absolutely." *Id.* In other words, the "right is not without just limitations." *Id.* at 224, 638 P.2d at 330. For example, this court has stated that "unless the witness denied to defendant could have produced relevant and material testimony benefiting the defense, there exists no constitutional violation." *Id.* at 224, 638

P.2d at 329; *see also Diaz*, 100 Hawai'i at 226, 58 P.3d at 1273 (noting that the right to compulsory process "is subject to limitations, the most important of which, is that the defendant may only obtain witnesses who can give relevant and beneficial testimony for the defense" (quotation marks omitted)); *State v. DeCenso*, 5 Haw.App. 127, 133, 681 P.2d 573, 578 (1984).

■ A trial court is not required to have a witness take the stand solely to invoke his privilege against self incrimination in front of the jury. *See State v. Sale*, 110 Hawai'i 386, 392–94, 133 P.3d 815, 821–23 (App.2006); HRE Rule 513; *see also, United States v. Edmond*, 52 F.3d 1080, 1109 (D.C.Cir.1995) ("[T]he accused's right to compulsory process does not include the right to compel a witness to waive his fifth amendment privilege[.]" (quotation marks omitted)); *United States v. Bowling*, 239 F.3d 973, 976 (8th Cir.2001) (same). Thus, "[o]nce a witness appears in court and refuses to testify, a defendant's compulsory process rights are exhausted." *United States v. Griffin*, 66 F.3d 68, 70 (5th Cir.1995). In *Griffin*, the defendants argued that their right to compulsory process guaranteed them the right to place a witness on the stand for the sole purpose of having that witness invoke an invalid Fifth Amendment privilege in the jury's presence. 66 F.3d at 70. The Fifth Circuit rejected this argument, noting that the "Sixth Amendment requires that a witness be brought to court, but it does not require that he take the stand after refusing to testify." *Id.*

■ Although William did not invoke his privilege against self incrimination in this case, the analysis of the Fifth Amendment cases is nevertheless pertinent. As the court noted in *Griffin*, "[i]t is irrelevant whether the witness's refusal is grounded in a valid Fifth Amendment privilege, an invalid privilege, or something else entirely." *Id.*

■ The right to compulsory process must therefore "be considered in the light of its purpose, namely, to produce testimony for the defendant." *United States v. Roberts*, 503 F.2d 598, 600 (9th Cir.1974). As the Ninth Circuit has observed, "[c]alling a wit-

ness who will refuse to testify does not fulfill [this] purpose[.]" *Id.; In re Bizzard*, 559 F.Supp. 507, 510 (S.D.Ga.1983).

In *Bizzard*, for example, a defense witness refused to testify out of a fear for his life after he had testified during an earlier trial. *Id.* at 509. Bizzard argued that his right to compulsory process was denied because the court did not enforce a subpoena of the witness. *Id.* at 510. The court rejected this argument, explaining that because the witness was excused as a witness after he had refused to testify, enforcing the subpoena "would have been an exercise in futility." *Id.*

Here, after the circuit court determined that Maryann would be allowed to recall William, William was transported to the courthouse, informed that he was there to testify, and knew that he had been subpoenaed to testify. After William refused to testify, Maryann requested that William be extracted from his cell. As explained by Deputy Sheriff Cayetano, extraction would have required command personnel to be notified, a team of officers to be assembled, equipment to be distributed, and an operational plan to be formulated. The team of officers may have consisted of SWAT team members in battle dress uniform or other personnel assigned to the courthouse cellblock. William would then be removed from his cell and transported to the courtroom. The circuit court noted that it was not concerned by the time necessary to have William extracted, but that it was nevertheless denying Maryann's request because the court didn't think "in the interest of justice and in fairness to both sides that would be helpful." The circuit court further explained that there would not be "any gain" in extracting William, since it "wouldn't work and wouldn't be helpful for the jury."

At that point, Maryann requested that she be allowed to call Deputy Sheriff Cayetano as a witness so that he could testify that William had been subpoenaed to testify but that he was refusing to do so. The State, however, argued that the jury should not be informed of William's refusal to testify. Specifically, the DPA stated "I don't want them to know anything, Your Honor." The circuit court repeatedly noted that, given William's

refusal to testify, it wanted to be fair to both sides and that it didn't want to confuse the jury. The circuit court therefore allowed Maryann to call Deputy Sheriff Cayetano as a witness. Deputy Sheriff Cayetano then testified that a subpoena was issued and served on William, William was transported to the courthouse to testify, William was informed that he was subpoenaed to testify as a witness, but that William was refusing to testify.

In these circumstances, Maryann was neither denied her right to compulsory process nor her right to a fair trial. The circuit court explicitly recognized Maryann's right to compulsory process, but concluded that having a team of law enforcement officers extract William from the courthouse cellblock and transport him to the courtroom solely to have him refuse to testify on the witness stand would not have resulted in "any gain" and "wouldn't [have been] helpful for the jury." We agree. As noted above, "unless the witness denied to [the] defendant could have produced relevant and material testimony benefiting the defense, there exists no constitutional violation." *Mitake*, 64 Haw. at 224, 638 P.2d at 329. Here, the record is clear that William would not have produced "relevant and material testimony benefiting the defense" because he refused to testify. Moreover, the circuit court allowed Maryann to call Deputy Sheriff Cayetano to testify that William was served with a subpoena, he was transported to the courthouse to testify, but that he was refusing to do so. Maryann also reminded the jury of William's refusal to testify during her closing argument. Specifically, Maryann argued that:

> Under oath, William told the California parole board twice, in 1991 and 1994, that he shot and killed Arauza and Hasker. But, oh, wait a minute. That didn't count, because it wasn't in court, because court is sacred. Court is like a church.

But, if court is so sacred, then why did he, when called to return to church this past Friday, refuse to come to church?

He flipped off the court, which he considers sacred. He flipped you off by refusing to testify.

Is that who you would place your unquestioned, beyond-a-reasonable-doubt belief in?

In these circumstances, the purpose of compulsory process—i.e., to produce testimony for the defendant—would not have been served by having William physically extracted from the courthouse cellblock and placed on the witness stand in front of the jury. *See Roberts*, 503 F.2d at 600, *Bizzard*, 559 F.Supp. at 510. Thus, Maryann was not entitled to have William refuse to testify in front of the jury. *See, e.g., Sale*, 110 Hawai'i at 392–94, 133 P.3d at 821–23. The circuit court therefore did not abuse its discretion in denying Maryann's request to have William extracted from his cell.[15]

Maryann now argues that the circuit court should have addressed William personally to inform him that he had been subpoenaed to testify, and that if he refused to testify "he could be held in contempt of court and imprisoned until he complied." However, those arguments are untimely and unpersuasive. First, at no point during the discussion regarding how the court should handle William's refusal to testify did Maryann request the circuit court to address William personally. Moreover, there is no suggestion in the record that such an exchange would have persuaded William to testify. Indeed, upon learning of William's refusal, the parties focused exclusively on whether William should be forced to refuse to testify in front of the jury. And Deputy Sheriff Cayetano testified under oath that William was informed of why he was brought to the courthouse and that he had been subpoenaed to testify. In these circumstances, the circuit court did not abuse

---

15. The dissent contends that the circuit court "refusal to allow reexamination of William as part of Maryann's case-in-chief" amounted to a denial of her right to compulsory process. Dissenting opinion at 293, 327 P.3d at 971. Respectfully, the circuit court did not refuse to allow Maryann's re-examination of William. In-

deed, William was transported to the courthouse for the express purpose of being recalled by Maryann. Once William was transported to court and refused to testify, Maryann's compulsory process rights were satisfied. *See, e.g., Griffin*, 66 F.3d at 70.

its discretion in not personally addressing William sua sponte.

▮ Maryann's assertion that the circuit court should have informed William that he could be held in contempt of court and imprisoned is equally unavailing. In many cases, a trial court may be able to compel an uncooperative witness to testify through its power to hold a witness in contempt of court. *See, e.g., LeMay v. Leander*, 92 Hawai'i 614, 621, 994 P.2d 546, 553 (2000) ("[T]he constitutional courts of Hawai'i possess the inherent power of contempt."). Here, however, as the circuit court recognized when it observed that, "There's not much I can do 'cause he's doing life," William's life sentence effectively prevented the court from compelling William's testimony. *See, e.g., Griffin*, 66 F.3d at 70 n. 1 ("[Witnesses's] life sentence prevented the court from doing anything more to compel him to testify."). In the unique circumstances of this case, therefore, the circuit court did not abuse its discretion in not personally informing William that he could be held in contempt of court and imprisoned if he refused to testify.

▮ Our conclusion that the circuit court did not abuse its discretion in denying Maryann's request to have William extracted is further buttressed by the "broad discretion" bestowed on the circuit court pursuant to Hawai'i Rules of Evidence Rule 611(a) in controlling the mode of interrogating witnesses. That rule provides:

> Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

HRE Rule 611(a).

As the commentary to the rule makes clear, HRE Rule 611(a) "states the common-law principle allowing the court <u>broad discretion</u> in determining order and mode of interrogation" and is intended to "define broad objectives and to leave the attainment of those objectives to the discretion of the court." HRE Rule 611(a), cmt. (citations omitted) (emphasis added). Trial courts are therefore afforded broad discretion in determining whether to recall a prosecution witness during the defense's case when that witness was extensively cross-examined during the prosecution's case-in-chief.[16] As explained below, the circuit court's denial of

---

16. Other jurisdictions have recognized the broad discretion granted to trial courts in such circumstances. *See United States v. Blackwood*, 456 F.2d 526, 529 (2d Cir.1972) ("[T]he trial court is the governor of the trial with the duty to assure its proper conduct and the limits of cross-examination necessarily lie within its discretion. And we should not overrule the exercise of that discretion unless we are convinced that the ruling of the court was prejudicial."); *United States v. Somers*, 496 F.2d 723, 734 (3d Cir.1974) ("A determination as to whether or not a witness should be recalled for further cross-examination is a matter for the discretion of the [trial] court, reviewable only upon a determination of an abuse of that discretion."); *United States v. Kenny*, 462 F.2d 1205, 1226 (3d Cir.1972) (affirming the refusal of a trial judge to recall a witness when the purpose of the recall was shown: (1) not to introduce substantive evidence, but rather was to further impeach the credibility of an already impeached witness; and (2) the documents upon which the requested examination would have been based were available at the time of the original cross-examination); *People v. Saddler*, 219 A.D.2d 796, 797, 632 N.Y.S.2d 361 (N.Y.App.Div.1995) ("There is no merit to the contention of defendant that he was denied his

constitutional rights of confrontation and compulsory process by the trial court's refusal to permit a prosecution witness to be recalled, after the prosecution had rested, for further cross-examination. The determination whether to reopen a case for further testimony is addressed to the reasonable discretion of the trial court and it cannot be said that, under the circumstances of this case, the trial court abused that discretion." (citing *People v. Frieson*, 103 A.D.2d 1009, 478 N.Y.S.2d 213 (N.Y.App.Div.1984))); 28 Charles Alan Wright and Victor James Gold, *Federal Practice & Procedure* § 6164, at 374–76 (1993) ("Deciding whether to permit a witness to be recalled often requires balancing the values identified by Rule 611(a) as pertinent to determining the order of proof.... Because the question is one of balancing conflicting values, appellate courts afford trial courts broad discretion to resolve these issues."); 3A *Wigmore on Evidence* § 1036, at 1041 (Chadbourn Ed. 1970) ("Where the impeacher is in danger of losing the use of his evidence by not having asked the preliminary question on cross-examination, the witness may of course be recalled in order to be asked. But this recall, like all others is in the discretion of the trial court[.]").

Maryann's request to extract William is consistent with the court's broad discretion in controlling the mode of interrogating witnesses.

First, Maryann's offers of proof demonstrate that she sought to recall William solely to impeach his credibility. Specifically, Maryann sought to elicit testimony from William that he was a cooperating witness in four murder cases, that he received preferential treatment as a result of this cooperation, that he would again seek preferential treatment for his cooperation in this case, and that it was not possible for UCLA law students to have contacted William while he was in protective custody. However, defense counsel had already elicited substantial evidence for the jury to consider in evaluating William's credibility, and in assessing any of his potential biases or motives, while cross-examining William extensively over the course of three days during the State's case-in-chief.

 It is well settled that the right of cross-examination protected by the Confrontation Clause of the Sixth Amendment is satisfied where sufficient information is elicited to allow the jury to gauge adequately a witness's credibility and to assess the witness's motives or possible biases. *See State v. Balisbisana*, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996); *State v. Birano*, 109 Hawai'i 314, 324, 126 P.3d 357, 367 (2006); *DeCenso*, 5 Haw.App. at 133, 681 P.2d at 578–79. Accordingly, the trial court does not abuse its discretion in excluding evidence tending to impeach a witness, as long as the jury has in its possession sufficient information to appraise the biases and motivations of the witness. *Balisbisana*, 83 Hawai'i at 114, 924 P.2d at 1220.

Here, William was extensively cross-examined by defense counsel, who elicited numerous inconsistencies in William's testimony that directly affected his credibility as a witness. There was also sufficient testimony from which the jury could fairly determine William's motive for testifying. William specifically stated that: he would lie in order to obtain favorable treatment, he would lie under oath, there was no objective way to judge if he was telling the truth, he reported the Hasker murder to divert suspicion away from him as being the shooter in the Arauza incident, he lied to Detective Ahn, he was a convict and that convicts do not tell the truth, he lies to police and prosecutors, and when he talks to police it is usually to improve his legal situation. Maryann was also able to elicit testimony that William stated, under oath, to the California Parole Board that he shot Hasker and Arauza, and that Maryann had nothing to do with those shootings. In sum, defense counsel was able to elicit substantial testimony during the State's case-in-chief that undermined William's credibility and established his potential motives and biases.[17]

Second, William's concern for his safety if he were called to testify regarding his informant activities provided an additional reason not to put William on the witness stand after he refused to testify. Specifically, William's concern was supported by his declaration in which he stated that he provided California authorities with "highly sensitive information" and that "other inmates in the prison system, and their friends and family outside of the system, have singled [him] out for retribution as a result of [his] cooperation with the State of California." As a result, his life was in "substantial danger because [of] threats and attempts." The record also contains a letter from California authorities "emphasiz[ing] the importance of protecting the identity of [ ] William" insomuch as he had "provided the Department of Corrections and Rehabilitation with highly sensitive information." The circuit court recognized this concern when it orally granted William's motion prohibiting video, photographic or sketch art images of William.

---

17. The dissent argues that William's right to confrontation was violated because, absent William's testimony as part of the defense's case-in-chief, "the jury would <u>not</u> have 'had sufficient information for which to make an informed appraisal of [the complainant's] motives and bias.' " Dissenting opinion at 299–300, 327 P.3d at 977–78 (alteration in original) (quoting *Balisbisana*, 83 Hawai'i at 116, 924 P.2d at 1222). Respectfully, however, for all the reasons set forth above, it is plain that the jury had substantial information from which to make an informed appraisal of William's potential motives and biases.

Third, although the circuit court denied Maryann's request to have William extracted, it allowed Maryann to call Deputy Sheriff Cayetano to testify in front of the jury that William had refused to testify. Deputy Sheriff Cayetano's testimony was damaging to the prosecution's case. Indeed, as noted above, during closing argument Maryann capitalized on William's failure to testify. Specifically, Maryann argued that William "flipped [the jury] off by refusing to testify," and asked whether "that [was] who [the jury] would place [their] unquestioned, beyond-a-reasonable-doubt belief in."

Maryann nevertheless argues that Deputy Sheriff Cayetano's testimony was not an adequate substitute for the evidence she sought to elicit through William's testimony. However, because William refused to testify, the circuit court was not presented with the option of presenting William's testimony to the jury.

For these reasons, the circuit court did not abuse its discretion in denying Maryann's request to extract William so that he could refuse to testify in front of the jury, and Maryann's rights. to compulsory process, to present a defense, and to a fair trial were not violated.

### E. The jury instructions on murder and accomplice liability were not prejudicially insufficient, erroneous, inconsistent, or misleading

Maryann argues that the jury instructions regarding murder and accomplice liability were erroneous. She argues that because the indictment charged her with "shooting" Hasker, the State was required to prove the "shooting" as an element of the offense, i.e., it was required to prove that she was the principal in the murder and not an accomplice. Thus, Maryann argues that the circuit court erred in giving the jury an instruction on accomplice liability. Similarly, Maryann argues that the murder instruction was erroneous because it failed to require the jury to find that she shot Hasker. As discussed further below, the circuit court's instructions on murder and accomplice liability were not prejudicially insufficient, erroneous, inconsistent, or misleading.

The jury was given the following instructions on murder and accomplice liability:

A person commits the offense of Murder if she intentionally or knowingly causes the death of another person.

There are two material elements of the offense of Murder, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That on or about the 18th day of June 1978, through and including the 20th day of June 1978, in the City and County of Honolulu, State of Hawaii, the Defendant intentionally or knowingly engaged in conduct; and

2. That by engaging in that conduct, the Defendant intentionally or knowingly caused the death of [ ] Hasker.

A person charged with committing the offense of murder may be guilty because she was an accomplice of another person in the commission of that offense. The prosecution must prove accomplice liability beyond a reasonable doubt.

A person is an accomplice of another in the commission of the offense of murder if, with the intent to promote or facilitate the commission of that offense, she, A, solicits the other person to commit it; or B, aids or agrees or attempts to aid the other person in the planning or commission of that offense.

Mere presence at the scene of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to that offense. However, if a person plans or participates in the commission of that offense with the intent to promote or facilitate that offense, she is an accomplice to the commission of that offense.

█ First, the instruction on accomplice liability was not erroneous. It is well settled that "one who is charged as a principal can be convicted as an accomplice without accomplice allegations being made in the indictment." *State v. Fukusaku,* 85 Hawai'i 462, 486, 946 P.2d 32, 56 (1997) (citation and internal quotation marks omitted) (emphasis

added); *State v. Albano*, 67 Haw. 398, 405, 688 P.2d 1152, 1157 (1984); *State v. Rullman*, 78 Hawai'i 488, 490, 896 P.2d 944, 946 (App.1995).

Maryann acknowledges that she could be subject to accomplice liability pursuant to this court's holding in *Fukusaku*, but argues, without further support, that *Fukusaku* should be overruled because "it fails to require the State to prove what it charged." Based on *Fukusaku*, however, the jury is not required to find "shooting" by Maryann in order to convict Maryann based on accomplice liability. 85 Hawai'i at 486, 946 P.2d at 56. Moreover, Maryann does not provide a compelling reason or legal basis to overrule *Fukusaku*. *See State v. Garcia*, 96 Hawai'i 200, 207, 29 P.3d 919, 926 (2001) (holding that the prosecution failed to provide a "compelling justification" for departing from the doctrine of stare decisis) (citing *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991)). Thus, the instruction on accomplice liability was warranted in this case.

■ Second, the murder instruction was not erroneous for failing to require the jury to find that she shot Hasker. HRS § 707–701, provided, in relevant part: "a person commits the offense of murder if he intentionally or knowingly causes the death of another person." Shooting a person with a firearm is not required by statute to prove murder, and as such does not constitute an essential element of the offense of murder.

Moreover, the inclusion of the "shooting" language in the indictment gave Maryann notice that she was subject to a mandatory minimum sentence if she was convicted as a principal. *State v. Apao*, 59 Haw. 625, 635–36, 586 P.2d 250, 257–58 (1978). In *Apao*, the defendant was charged with the murder of an individual that was a witness in a murder prosecution, thus, making the defendant eligible for enhanced sentencing. *Id.* at 627, 633–34, 586 P.2d at 253, 257. On appeal to this court, the defendant argued, inter alia, that the indictment was defective because of the inclusion of language that the defendant knew the victim was a witness in a murder prosecution, which was not an element of the murder charge. *Id.* at 633, 586 P.2d at 257.

This court noted that "the victim's status as a witness in a murder prosecution was not an essential element of the crime of murder[.]" *Id.* at 634, 586 P.2d at 257. However, this court determined that by including the allegation that the victim was a prosecution witness in another murder case, the defendant was given "fair notice of the charges against [him]." *Id.* at 636, 586 P.2d at 258.

Similarly, here, the indictment gave Maryann "fair notice" that she could be facing a mandatory minimum term of imprisonment if she was convicted as a principal. *See Garringer v. State*, 80 Hawai'i 327, 333–34, 909 P.2d 1142, 1148–49 (1996) (holding that the imposition of a mandatory minimum term of imprisonment due to a firearm enhancement is limited to those defendants who "personally possess, threaten to use, or use a firearm while engaged in the commission of [a] felony").

Moreover, it appears that Maryann was not found guilty as a <u>principal</u> for the murder of Hasker. Although found guilty of murder, the jury determined in a special interrogatory that the State failed to prove that Maryann "actually possessed, used, or threatened to use a pistol" during the commission of Hasker's murder. Thus, it appears that Maryann was not convicted as a principal, but rather as an accomplice. For these reasons, the murder instruction was not erroneous for failing to include "shooting" language.

Accordingly, the jury instructions on murder and accomplice liability were not prejudicially insufficient, erroneous, inconsistent, or misleading.

**F. The circuit court did not commit multiple errors warranting retrial**

Citing *State v. Sanchez*, 82 Hawai'i 517, 923 P.2d 934 (App.1996), Maryann argues that the cumulative effect of the circuit court's multiple instances of error violated her right to a fair trial. Because Maryann's arguments regarding the alleged errors at her retrial are without merit, it cannot be said that Maryann was denied the right to a fair trial.

## IV. Conclusion

For the foregoing reasons, the circuit court's judgment is affirmed.

Concurring and Dissenting Opinion by ACOBA, J., in which McKENNA, J., Joins.

In my view, the decision by the circuit court of the first circuit (the court) denying the request of Petitioner/ Defendant–Appellant Maryann Acker (Maryann) to recall Respondent/Defendant William Acker (William) as a witness in her case-in-chief violated Maryann's constitutional right to compulsory process, right to confrontation, right to present a complete defense, and right to a fair trial. *See* U.S. Const. amend. VI, XIV; Haw. Const. art. I, § 14. Respectfully, the court's decision to accept the testimony of Deputy Sheriff Thomas Cayetano (Deputy Cayetano) that William refused to testify was an insufficient substitute for the protection of such rights, and their denial was not harmless beyond a reasonable doubt. Accordingly, I would remand this case for a new trial.[1]

## I.

## A.

Briefly, this case involves a charge against Maryann for the murder of Lawrence Hasker (Hasker) in 1978, an incident involving Maryann, who was 18, and William, who was 28 at the time of the crime. In June of 1978, the recently married couple was in Hawai'i and took part in two criminal incidents, one involving the robbery of Joseph Leach (Leach) and one involving the robbery and murder of Hasker. In August 1981, William and Maryann were indicted in Hawai'i for various charges related to these two incidents. William pleaded guilty to robbing Hasker and agreed to testify against Maryann. Maryann was tried in Hawai'i in 1982,

and William testified for the prosecution at her trial, stating that Maryann shot Hasker. Maryann was found guilty of the charges regarding the Leach incident and the murder of Hasker. Maryann appealed to this court, which affirmed her convictions.

In 1991, while he was incarcerated in California, William apparently testified under oath at a hearing before the California Parole Board (Parole Board) that he was solely responsible for Hasker's murder. *See Acker v. State*, No. 27081, 115 Hawai'i 476, 2007 WL 2800803 (App. Sept. 27, 2007) (SDO). On August 15, 2000, Maryann filed a Hawai'i Rules of Penal Procedure (HRPP) Rule 40 petition for post-conviction relief, on the basis, *inter alia*, that William had admitted that he killed Hasker. *Id.* The court granted Maryann's HRPP Rule 40 petition, and on appeal, the Intermediate Court of Appeals (ICA) concluded that the State's failure to disclose the true facts concerning William's nolo contendere plea in connection with another incident in California, his conviction on first degree murder rather than felony murder, and sentence in California to life <u>with</u> the possibility of parole denied Maryann a right to a fair trial on the charge of murdering Hasker. *Id.* at *2–3. Maryann was granted a new trial. *Id.* at *3. This retrial is the basis for the current appeal.

## B.

### 1.

The retrial began on August 18, 2009.[2] The primary issue was the credibility of the two primary witnesses, William and Maryann. William testified as part of the State's case-in-chief. He related, *inter alia*, that Maryann shot Hasker, stating that he did not threaten or force Maryann to go along with the robbery because, "[w]e did this together. There was no force. She wasn't compelled to

---

**1.** I concur with the majority that the court did not abuse its discretion in denying Maryann's motion for a mistrial, majority's opinion at 279, 327 P.3d at 957, that the State's use of the Presentence Report to question Maryann during cross-examination was harmless beyond a reasonable doubt, majority's opinion at 276–77, 327 P.3d at 954–55, and that the jury instructions on murder and accomplice liability were not prejudicially insufficient, erroneous, inconsistent or

misleading, majority's opinion at 279–81, 327 P.3d at 957–59. Inasmuch as I would hold, based on the discussion herein, that the judgment of conviction must be vacated and the case should be remanded for a new trial, the other questions presented by Maryann's Application are not addressed.

**2.** The Honorable Michael A. Town, presided.

do anything. At any time she could have left. Any time."

On cross-examination by defense counsel, William was asked, "[d]o you ever lie under oath, commit perjury as it pertain[ed] to Maryann?" William responded that he "never lied in court." Defense counsel then asked, "have you ever lied under oath as it pertains to Maryann?" William then asked the court, "does a board hearing count?" The court responded, "[i]f it's under oath, yes, I don't know what the board—I assume we are talking about a California board hearing; is that right?" The court then held a bench conference, after which it struck "that last whole series of questions about perjury and the answers" and directed the jury to disregard those questions and answers.

Defense counsel asked William about a 1978 report in which he admitted to using cocaine since the age of 18, using one to two grams on a daily basis for approximately three months, and supporting his cocaine habit by selling narcotics and robbing individuals. William stated that he lied to the report writer so that he could go to a "rehab center as opposed to prison." According to William, he would lie to get himself out of prison, but that he would not lie under oath. Another bench conference took place. Defense counsel then resumed questioning. He asked William whether he had ever committed perjury or lied under oath as it related to Maryann. William testified, "I don't think so . . . I could have, but not in court. There's a lot of times you take oaths, but not in court." Defense counsel posed the question of whether William had "ever lied under oath as it pertains to anything about Maryann[,]" to which he responded, "[p]robably." Defense counsel then asked, "[w]hen you lied under oath about Maryann, was there any repercussion to you?" William responded "[n]o, there wasn't because there wasn't a lie on her. I'm trying to do something for her."

William further testified, on cross-examination, regarding an "agreement or deal" with the prosecution. He reported that the prosecution gave him immunity for the case involving Leach and Hasker, except as to a robbery count. William said that the deal meant that he could never be charged or convicted of Hasker's murder. The defense attorney elicited further declarations from William that he avoided 65–75 years of time in prison by signing the agreement, not including the life sentence he would have served if he had been convicted of killing Hasker. Defense counsel also questioned William about the lack of physical evidence supporting his assertion that Maryann shot Hasker, and about his willingness to lie.

Additionally, defense counsel inquired about William's 1991 sworn statements to the Parole Board that he committed the murder in Hawai'i, of Hasker. He was asked, "[a]nd in fact, [the Parole Board] asked you specifically point blank, Maryann didn't do anything? And you said, Absolutely nothing[,]" to which William responded, "[y]eah. That's exactly what I said. I wanted her to get out."

On re-direct examination, the prosecutor asked William about the Parole Board hearing and admitting to shooting Hasker. William testified that he had tried to clear Maryann's name because some law students from UCLA that were on Maryann's case urged him to do so:

> I basically put myself in [Maryann's] position to try—because some lawyers from UCLA that were on her case, student lawyers, in corresponding with me told me that I could free her. She could go home if I said these things to the board. Well, they lied. They lied. Just like they lie. So I did say it. I lied trying to get her off. And they lied and I didn't get out—she didn't get out, nor did I. I probably wouldn't have got out as quick as she would have. But they led me to believe she would—her next board hearing she would be out.

2.

Several other witnesses also testified for the prosecution, including Deputy Sheriff Ahn (Deputy Ahn), who was assigned to investigate the murder of a Cesario Arauza (Arauza) in California. On October 9, 1979, William contacted Deputy Ahn and talked to him about the Arauza homicide and the criminal activities involving William and Maryann in Hawai'i. According to Deputy Ahn, Wil-

liam indicated that he and Maryann robbed Leach and Hasker, and Maryann shot Hasker. Deputy Ahn testified that he had official contact with William between 50 and 75 times while William was "in [his] custody."

### 3.

Maryann testified during the defense's case-in-chief. During her testimony, she stated that she was coerced into taking part in the events surrounding Hasker's murder. According to Maryann, "[William] would hold the gun to my head or my ribs and tell me I would do what he said." She explained that she was forced to burglarize Hasker's apartment and that although she was with William prior to the murder, she did not know what was happening. Maryann said she was "[e]ighteen years old and married to this guy and doing what my husband told me to do." She testified that she saw William exit the car, holding a gun, with Hasker and that the two men went down an embankment. She heard gunshots, and then William returned to the car.

Maryann also stated that, contrary to William's explanation of his statements before the Parole Board, she was never represented by "UCLA" law students at any point prior to 1994, but instead was represented by University of Southern California (USC) law students in 1995.

### 4.

After Maryann finished testifying as part of the defense's case-in-chief, the court had a discussion with the attorneys, outside the presence of the jury, about additional witnesses for the defense. The court asked why the defense was planning to call William, and defense counsel explained that there were two reasons. The first reason appeared to be related to Deputy Ahn's testimony about the number of times he met with William:

[Defense Counsel:] Your Honor, I'm calling him for two reasons. One is that the prosecution read the transcript of the prior testimony of [Deputy] Ahn who said—again, I may be incorrect but something in the lines of 50 to 75 times that he met with [William].

. . . .

And the jurors [have] to be wondering why is he meeting with [William] 50 to 75 times? And the reason is [ ] because [William] was, in the nomenclature, a jailhouse informant.

THE COURT: He was cooperating

[Defense counsel:] He was cooperating.

The second reason was that William had testified that prior to his 1991 and 1994 Parole Board hearings, law students representing Maryann contacted him and told him that if he took responsibility, Maryann would be released from prison. Defense counsel related he wanted to ask William about this, because "[h]e was in protective custody[;] there's no way he could have talked to any of these lawyers." The prosecutor asked that, if William was recalled as a witness, that the questions be narrowly tailored, and that they "have time to tell [William] what he's going to be put back on the stand for."

On the following day, the court indicated that it had a chambers conference with Deputy Cayetano, and that "it's wise if we get his testimony for the record." The deputy was then called to testify outside the presence of the jury. No objection was raised. Deputy Cayetano testified that, pursuant to a subpoena, William was transported from the correctional facility to the courthouse, and was being held in the courthouse cell block. William was told why he was brought to court and informed that he had been subpoenaed to testify. William apparently told Deputy Cayetano that he did not want to testify. According to the deputy, William's "primary concern is for his safety and well-being." Deputy Cayetano also testified to the "extraction" process, which "means that you can remove [William] from his cell and bring him to the courtroom." He indicated it would take approximately "an hour to two hours" to do the procedure.

On cross-examination, the prosecutor asked whether William had been informed "of what his testimony would be[,]" specifically "that it would be with regard to the cooperation or testimony he's given in other cases on the mainland[.]" Deputy Cayetano confirmed this and that it "was on those issues

that [William] was concerned for his safety[.]"

Defense counsel made his request to have William produced. The court inquired of counsel as to whether William would refuse anyway. Defense counsel responded, "[w]ell, he can refuse if he chooses, but I mean, I'm entitled to put on a defense." The following offer of proof was made by defense counsel on-the-record, as to the relevance of William's testimony:

After the jury heard the prior testimony of [Deputy] Ahn, who testified previously that he—since 1979 through 1982, at the time of the testimony, that he had met with William [ ] 58 to 75 times. And the jury would obviously hear that and say, well, why are they meeting 50 to 75 times? They can raise all kinds of inferences or jump to certain conclusions as to why, and perhaps that is used—that type of information is used to bolster the credibility of William [ ].

The fact of the matter is that William [ ] was a cooperating witness with the California sheriff's office in a number of homicides. . . .

. . . .

Now, in the 1991 parole hearing where he said under oath that Maryann did not shoot [ ] Aruaza or [ ] Hasker, that he shot both of them and that he committed perjury against Maryann, what the jury was not allowed to hear at that point in time was that he was also quick to clarify that he did not lie in any other trial or any other information that he gave. And so that he's clarifying to say, [h]ey, yes, I lied against Maryann, but in all these other cooperating or informant activities, I did not lie. And he wanted to make sure that the parole board heard that. And that was in the 1991 parole board.

. . . .

Now, we'd also—talking to him about when he testified that prior to his 1991 and 1994 hearings, that UCLA students representing Maryann contacted him and told him what to say. Or it's not really clear

exactly what they told him to say. And that we further go on, well, if his name and location were secrets, that he doesn't want to come into court and talk about it, he doesn't-he doesn't want his picture taken, then how did these students from UCLA, who were representing him[3], able to contact him personally and tell him to say what they wanted him to say if he is in protective custody and his name, identity, an location are secret.

And that after this trial, he can again go to the [ ] Parole Board and state that he testified for the prosecution in an effort to gain parole. And that he could try to use his testimony in court for his benefit. And that as he did testify under oath, that he's always trying to gain a favorable legal position.

(Emphases added.) The court ultimately denied the request, stating, "I'm going to refuse your request to extract [William] because I don't think there would be any gain and it would be—just wouldn't work and wouldn't be helpful for the jury."

The court, however, suggested that it should "at least put [Deputy Cayetano] on the stand in front of the jury and say [William] refuses to testify." The prosecutor raised concerns that the deputy sheriff's statement that William refused to testify would be hearsay and was not relevant. However, the court ultimately concluded that it would allow Deputy Cayetano to take the stand, over the State's objection. The deputy testified that William was transferred to the courthouse to testify as an adverse witness in the defendant's case, but William refused to do so.

5.

During closing argument, the State argued that William was a credible witness and that Maryann had shot Hasker. The defense, on the other hand, alleged that William was not a credible witness, referring to his inconsistent statements under oath regarding Maryann's involvement in the murders of Hasker

---

**3.** William's testimony reflected that the UCLA law students were representing *Maryann,* not William.

and Arauza. For example, defense counsel argued that "William [ ] admitted that he committed perjury against Maryann. William admitted under oath that he shot and killed [ ] Hasker and [ ] Arauza. And he did it more than once."

In its rebuttal closing, the State again emphasized the credibility of William's testimony, as follows:

[Defense counsel] wants you to believe that at the time William [ ] gave his first statement to [Deputy] Ahn regarding the Hawai'i and the California incidents saying that Maryann was the shooter, he was trying to save himself. [Defense counsel] says that [William] knew that [Maryann] had been convicted. [William] knew that the use allegation was found untrue, and therefore, he must be the shooter.

Well, think back to the testimony, ladies and gentlemen. And you recall, when William [ ] was shown Maryann['s] judgment on the stand, that was the first time he had ever seen it. He did not know that she had her use allegation stricken. He only knew that she had been convicted of murder. And recall, the conviction happened in January. William [ ] didn't say anything to [Deputy] Ahn until March, after he had that meeting with [Maryann] ... where she said, "Have you snapped? I killed [ ] Arauza."

And at that point, he just gave up, ladies and gentlemen. He pled nolo contendere, no contest. It's not an admission, but the [c]ourt did not find him guilty of everything charged. There was no trial, no admission, but he just gave up. He didn't ask for anything. He didn't get anything. He's still in custody today.

(Emphases added.) Defense counsel then objected to the prosecutor's argument as follows:

It's improper. We weren't allowed to present the testimony of William that he made all these deals on the side and he was trying to get something out of it. So, I mean, he's saying that he didn't get anything out of it. He didn't have any

other ulterior motive. That's not true. We couldn't present that evidence because he refused to testify.

(Emphases added.) The court overruled the objection.

### C.

The jury found Maryann guilty of murder. Maryann appealed to the ICA, and the ICA affirmed Maryann's conviction in its October 12, 2012 Memorandum Opinion. *State v. Acker*, 128 Hawai'i 497, 291 P.3d 395, 2012 WL 4857018, at *1 (App. Oct. 12, 2012). The ICA concluded, in relevant part, that "the manner in which the [ ] court addressed William's refusal to be recalled as a witness in the defense case did not deprive Maryann of a fair trial." *Id.* at *16.

### II.

The court's decision prohibiting Maryann from recalling William as part of the defense's case-in-chief violated Maryann's (1) right to compulsory process, (2) right to confront adverse witnesses, (3) right to present a defense, and (4) right to a fair trial.[4] Under the circumstances, the court's decision to prohibit the defense from calling William as a witness cannot be said to be harmless beyond a reasonable doubt.

The majority's analysis of the court's decision precluding re-examination of William ultimately rests on the scope of a trial court's discretion over the presentation of the evidence. *See* majority's opinion at 283–84, 327 P.3d at 961–62. However, any discretion afforded the court in this context must bow to constitutional principles. *See e.g., State v. Peseti*, 101 Hawai'i 172, 181, 65 P.3d 119, 128 (2003) (holding that "when a statutory privilege interferes with a defendant's right to cross-examine," the statutory privilege is secondary to the defendant's constitutional rights); *State v. Apilando*, 79 Hawai'i 128, 141, 900 P.2d 135, 148 (1995) (admission of the complainant's videotaped interview with police, in lieu of her direct examination, violated the defendant's right of face-to-face

---

4. In her Application, Maryann maintains that the court's refusal to enforce the subpoena that Maryann had served on William violated her right to compulsory process and her right to present a defense. The State's response brief does not address this point of error.

confrontation); *State v. Grindles*, 70 Haw. 528, 532, 777 P.2d 1187, 1190 (1989) (holding that despite the court's discretion to control the order of proof, it could not compel the defendant to present his evidence before hearing all of the state's evidence against him, because that was a violation of his due process right to a fair trial). As will be explained *infra*, the court did in fact abuse its discretion under the evidentiary rules in denying the defense's recall of William, and in failing to support its decision. The constitutional rights at issue are discussed first.

## III.

### A.

"In all criminal prosecutions, the accused shall enjoy the right to ... have compulsory process for obtaining witnesses in the accused's favor[.]" Haw. Const. art. 1 § 14. A criminal defendant's right to compulsory process is set forth both in the Hawai'i Constitution and in the Sixth Amendment of the U.S. Constitution. *See* U.S. Const. amend. VI. This court has recognized that "[t]he right to compulsory process is of paramount importance in assuring a defendant the right to a meaningful defense and a fair trial." *State v. Mitake*, 64 Haw. 217, 224, 638 P.2d 324, 329 (1981) (citations omitted). Further, the right to compulsory process "affords a defendant ... not only the power to compel attendance of witnesses, but also the right to have those witnesses heard." *Id.; see also Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (describing the Sixth Amendment's guarantee as "the accused's right to call witnesses whose testimony is 'material and favorable to his defense.'" (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982))).

Of course, the right to compulsory process does not guarantee the absolute right of a defendant to call all potential witnesses. *See id.* Nevertheless, a defendant has the right

to compel the attendance of witnesses who may give "relevant and beneficial testimony." *Id.* It is readily apparent that the court's refusal to allow re-examination of William as part of Maryann's case-in-chief <u>did</u> amount to a denial of her right to compulsory process.[5]

### B.

William had testified as part of the prosecution's case-in-chief. But, when it came time for him to testify as an adverse witness during the defense's case, William apparently declined. Thus, defense counsel was compelled to request that William be ordered to appear and testify. Despite recognizing that its ruling would result in William being able to choose to testify for the prosecution, <u>but not for the defense,</u> the court decided not to bring William to the courtroom. This was a manifest violation of the right to compulsory process.

Maryann was not simply asking to secure the presence of a witness in her defense, but asking to secure the presence of a witness who <u>had already testified in the case for the prosecution and who was present at the courthouse.</u> It is well-established that a party may call a witness for the sole purpose of impeaching that witness. *See* Hawai'i Rules of Evidence (HRE) Rule 607 (1993) ("The credibility of a witness may be attacked by any party, including the party calling the witness."). Under these circumstances, it is evident that the court should have recalled William to testify, in light of the fact that compulsory process is "of paramount importance in assuring a defendant the right to a meaningful defense and a fair trial." *Mitake*, 64 Haw. at 224, 638 P.2d at 330 (citations omitted).

### C.

Furthermore, setting aside the fact that William had already testified, it is plain that William's testimony would have been both "relevant and beneficial" and therefore would

---

5. The majority states that "[o]nce William was transported to the court and refused to testify, Maryann's compulsory process rights were satisfied." Majority's opinion at 283 n. 15, 327 P.3d at 961 n. 15. As will be discussed *infra*, it is not enough that William merely be transported to the

courthouse. Instead, by refusing to bring William to the <u>courtroom,</u> the court did not allow reexamination and Maryann's right to compulsory process was not satisfied. It was not enough that William merely tell Deputy Cayetano that he would not testify.

satisfy the standard for calling a witness under this court's case law on the right to compulsory process. *Id.* In support of his request to examine William during the defense's case-in-chief, defense counsel had made an offer of proof for the court that included a number of reasons why William's testimony would be "relevant and beneficial."

After William's testimony for the prosecution, Deputy Ahn had testified for the prosecution as to the number of times that he had met with William, specifically stating that he had met with William for up to 75 times between 1979 and 1982. Defense counsel evinced his concern that this testimony bolstered William's credibility as opposed to Maryann's, when in fact William was a cooperating witness in a number of other, unrelated cases. Thus, defense counsel sought to expose William's intent or motive for meeting with Deputy Ahn.

Any information that would help the jury evaluate William's credibility was vital to the defense, and therefore "relevant." Defense counsel indicated that such questioning would clarify for the jury that not all of the meetings between William and Deputy Ahn were regarding the incidents involving Maryann, but rather, resulted from William's continuing status as an informant in other cases. William's connection to law enforcement officials would have a tendency to influence the jury's view of his credibility in favor of William. By exposing this connection, defense counsel could mitigate any boost in credibility William received from Deputy Ahn's testimony about his contacts with law enforcement. Thus, such information would also be "beneficial" to the defense. *See Mitake,* 64 Haw. at 224, 638 P.2d at 330.

The conclusion that this testimony was necessary in assuring Maryann a meaningful defense is evident in light of the prosecution's final argument. The prosecution stated that, "[Defense counsel] wants you to believe that at the time William [ ] gave his first statement to [Deputy] Ahn regarding the Hawai'i and the California incidents saying that Maryann was the shooter, he was trying to save himself." As noted, the prosecution went on to allege that "[William] pled nolo contendere, no contest. It's not an ad-

mission, but the [c]ourt did find him guilty of everything charged. There was no trial, no admission, but he just gave up." The prosecution emphasized that William did not get anything in exchange for his meetings with Deputy Ahn: "He didn't ask for anything. He didn't get anything. He's still in custody today." Although the prosecution states that this reference was not related to Hasker, but rather, William's cooperation in the Arauza case, for which he met with Deputy Ahn, it is easy to see that the jury might be confused about William's activities as a cooperating witness. Had the defense been able to question William, on the stand, <u>about Deputy Ahn's testimony,</u> the extent to which William did or did not receive anything in exchange for his statements about the criminal activity allegedly involving Maryann and his motive for such statements, it would have enabled the jury to meaningfully judge William's credibility.

As part of his offer of proof, defense counsel sought to introduce testimony regarding William's nolo contendre plea in the Arauza case, and the recommendation that William be committed to a California state hospital, rather than to prison. It is far from evident that in fact William "didn't get anything" in exchange for his testimony. But the defense was foreclosed from access to William on this issue, and thus prevented from fully responding to the prosecutor's argument that William did not ask for anything and did not get anything. William's testimony on direct during the defense's case would have been highly relevant to the key issue of William's credibility, and would have been beneficial in uncovering what exactly took place with respect to William's cooperation in the Hasker and Arauza cases.

Defense counsel also asked to recall William to ask him about his 1991 testimony under oath when he stated that Maryann did "[a]bsolutely nothing." Without a doubt, this was relevant to William's credibility, since his inconsistent testimony in this case was that Maryann <u>did</u> shoot Hasker. According to the special interrogatory, the jury ultimately found that Maryann did not "possess[ ], use[ ], or threaten[ ] to use a pistol" during the commission of the murder. However,

William's testimony before the Parole Board in 1991 was still pertinent because he said that Maryann did "[a]bsolutely nothing[,]" which would be directly contrary to the jury's ultimate finding that Maryann was liable for the commission of the crime.

As to the 1991 testimony under oath, defense counsel indicated that he sought to clarify several inconsistencies in William's explanation about why he was lying in 1991 when he confessed to the shooting and said that Maryann did nothing. First, William said that he was told to confess by UCLA students, but defense counsel sought to question William on how these law students were able to contact him despite the fact that he was in protective custody, a matter which directly bore upon William's credibility.

Second, and directly related to Maryann's testimony during the defense's case-in-chief, defense counsel needed to question William about his assertion that the UCLA students were representing Maryann in 1991. Maryann had testified that she was not represented by law students until 1994, and that the students were from USC. Thus, Maryann had testified, after William, in a way that directly contradicted William's explanation of why he previously said under oath that Maryann "did nothing" in the Hasker case.

These contradictions would directly affect William's believability as a witness. Questioning William on those issues could demonstrate to the jury that William was actually telling the truth at the 1991 Parole Board hearing, and lying in the instant case. In other words, if William had no motive to lie in 1991 when he said that Maryann "did nothing", then the jury may have believed that that was the truth. Thus, such evidence would also be beneficial to Maryann's case. Even if the jury did not affirmatively decide that William was telling the truth in 1991, defense counsel's ability to impeach William with Maryann's subsequent testimony would have the effect of further casting doubt upon William's veracity in asserting that Maryann

"could have walked away" from the commission of the crimes.

Because defense counsel was able to show, in his offer of proof, that William's testimony would have been relevant and necessary, the court's order precluding William from being questioned under oath violated Maryann's right to compulsory process under the Hawai'i Constitution and the United States constitution. As noted, this error was particularly egregious inasmuch as William provided extensive testimony during the prosecution's case-in-chief, but was allowed to choose not to testify in the defense's case.

### D.

### 1.

In asserting that Maryann's right to compulsory process was satisfied in this case, the majority states that "[a] trial court is not required to have a witness take the stand solely to invoke his privilege against self-incrimination in front of the jury." Majority's opinion at 282, 327 P.3d at 960. Despite the fact that William did not invoke his Fifth Amendment privilege against self-incrimination, the majority analogizes cases involving the Fifth Amendment.[6] However, such analysis is inapposite for several reasons.

First, in the context of the privilege against self-incrimination, a witness may lawfully refuse to testify. *State v. Kamanao*, 103 Hawai'i 315, 320, 82 P.3d 401, 406 (2003) ("Pursuant to the fifth amendment to the United States Constitution and article I, section 10 of the Hawai'i Constitution, a criminal defendant has the right to remain silent and not incriminate himself or herself in a criminal proceeding." (citations omitted)). When a witness refuses to testify for other reasons, however, the refusal may be unlawful—as it was in this case.

William had waived his fifth amendment right by testifying for the prosecution in the case, and therefore would have had to respond to questioning as part of the defense's

---

**6.** The Fifth Amendment to the United States Constitution provides that "No person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. Simi-

larly, the Hawai'i Constitution provides that "nor shall any person be compelled in a criminal case to be a witness against oneself." Haw. Const. art. 1, § 10.

case-in-chief, or risk prosecution for obstruction of justice, *see* HRS § 710–1072.5 (1993), or an order of contempt, or possibly rescission of the agreement he had with the prosecution regarding testifying at trial. This court has never held that one party has the sole right to a witness. For example, in *State v. Diaz*, 100 Hawai'i 210, 58 P.3d 1257 (2002), the defendant sought to call a witness for the defense's case-in-chief who then exercised her constitutional right not to testify pursuant to the Fifth Amendment. 100 Hawai'i at 216, 58 P.3d at 1263. *Diaz* held that "[the defendant's] sixth amendment right to compulsory process [would] not be satisfied at the expense of [the witness's] fifth amendment right to remain silent." *Id.* at 227, 58 P.3d at 1274. In *Diaz*, however, the witness had not already testified for the prosecution thereby waiving his Fifth Amendment right. *Id.* at 216, 58 P.3d at 1263.

Under the circumstances presented here, contrary to the majority's contention, the court was required to have William take the stand. As will be discussed *infra*, we do not know if William would have refused to testify if he had in fact taken the stand, or if he would, the extent of his recalitrance. However, even in the event that William still refused to testify, it would have been readily apparent to the jury that such refusal was unlawful. This is unlike the situation where a witness successfully invokes his or her privilege against self-incrimination, which serves as a valid basis for the witness to step down. *Kamanao*, 103 Hawai'i at 320, 82 P.3d at 406 ("The right to remain silent, otherwise referred to as the privilege against self-incrimination, provides us with some of our most treasured protections—preservation of our autonomy, privacy, and dignity against the threat of state action." (citation and internal quotation marks omitted)).

Second, the cases cited by the majority in fact illustrate that an analogy to the right against self-incrimination is not apropos. In *State v. Sale*, 110 Hawai'i 386, 133 P.3d 815 (App.2006), the defendant argued that the circuit court abused its discretion in refusing to call his nephew to the stand to invoke his Fifth Amendment privilege in front of the jury. 110 Hawai'i at 392, 133 P.3d at 821.

In upholding the circuit's court determination, the ICA relied on HRE Rule 513 (1993), which provides that "[i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury." *Id.* (quoting HRE Rule 513(b) (emphasis added)). William was not asserting a privilege, under the facts should not have been able to assert a privilege, and moreover did not take the stand, and so the rationale underlying HRE Rule 513 does not apply.

The majority cites to *U.S. v. Edmond*, 52 F.3d 1080 (D.C.Cir.1995), stating that " '[T]he accused's right to compulsory process does not include the right to compel a witness to waive his fifth amendment privilege[.]' " Majority's opinion at 282, 327 P.3d at 960 (quoting *Edmond*, 52 F.3d at 1109). In other words, the Sixth Amendment compulsory process right is subsumed where it conflicts with the Fifth Amendment right against self-incrimination. *Id.* This does not affect whether or not a witness not claiming the Fifth Amendment privilege or who could not assert the privilege, must take the stand. Similarly, *United States v. Bowling*, 239 F.3d 973 (2001), holds that a defendant's "right to compulsory process ... does not include the right to compel a witness to waive his or her Fifth Amendment privilege against self-incrimination." 239 F.3d at 976. In *Bowling*, the witness in question did not testify for either the government or the defense, because he asserted his Fifth Amendment privilege. *Id.* Here, in contrast, William testified for the government, but refused to testify for the defense.

The majority's citation to the decision by the Fifth Circuit Court of Appeals in *United States v. Griffin*, 66 F.3d 68 (5th Cir.1995) is similarly unavailing. *See* majority's opinion at 285, 327 P.3d at 963. There, the Fifth Circuit stated that "[t]he Sixth Amendment requires that a witness be brought to court, but it does not require that he take the stand after refusing to testify[;]" *id.* at 282, 327 P.3d at 960 (emphasis added), however, William was not even brought into court. Instead, the court heard a secondhand account of William's refusal to testify. Thus, even under *Griffin*, the procedures in this case

were insufficient to satisfy Maryann's right to compulsory process. *See id.* ("Once a witness appears in court and refuses to testify, a defendant's compulsory process rights are exhausted.").

### 2.

While the majority notes that the purpose of the right to compulsory process is to produce testimony for the defendant, majority's opinion at 285, 327 P.3d at 963 (citing *United States v. Roberts,* 503 F.2d 598, 600 (9th Cir.1974)), in this case it is impossible under the court's procedure to know whether William would have produced testimony for Maryann, and so fairness required that William be brought to the courtroom.

The facts of this case are thus distinguishable from those of *In re Bizzard,* 559 F.Supp. 507 (S.D.Ga.1983), where that court refused to enforce a subpoena calling a particular witness to testify. 559 F.Supp. at 510. There, the witness had taken the stand in a previous trial involving the same events and had refused to testify. *Id.* at 509. Here, as will be discussed *infra,* in contrast, William had already testified in the same trial for the prosecution, and aside from an indication provided through the intermediary of Deputy Cayetano, the court had no other reason to believe that William would not respond to questions regarding the content of his earlier testimony in the trial.

### 3.

The majority alleges that William would not have been able to provide relevant and material testimony for the defense. Majority's opinion at 283, 327 P.3d at 961. But, the very purpose of recalling William was to impeach him based on Deputy Ahn's and Maryann's testimony, which followed after William's earlier testimony. The majority cannot forecast what would have happened if William was examined on Ahn's and Maryann's testimony, because, as a result of the court's ruling, William could not be examined

on matters that were submitted into evidence after his testimony for the prosecution.

Maryann had an absolute right to question William to "further impeach" him, especially because the impeachment was based on evidence introduced after William had testified. As will be discussed *infra,* "a defendant has a constitutional right to present any and all competent evidence in his [or her] defense." *State v. Kassebeer,* 118 Hawai'i 493, 514, 193 P.3d 409, 430 (2008) (emphasis added) (citing *State v. Horn,* 58 Haw. 252, 255, 566 P.2d 1378, 1380 (1977)). Because Maryann could not impeach William based on Deputy Ahn's and her testimonies at trial, Maryann was denied the right to present any and all competent evidence in her defense.[7] *Id.*

Further, evidence of the number of times that William met with Deputy Ahn is not the same evidence as an acknowledgment of William's own plea bargain. The testimony regarding Deputy Ahn would raise the jury's estimation of William's credibility beyond only his plea agreement. Since this information had never been addressed by William, clearly his testimony in Maryann's direct case would not have been "substantially the same" as the evidence already received.

Defense counsel also sought to clarify issues in Deputy Ahn's testimony about the nature of William's cooperation and what he had received in exchange for the cooperation. Had the defense been allowed to re-examine William, the defense might have been able to discredit his testimony by showing that in fact, William lied in other cases.

Moreover, the offer of proof regarding whether or how William was contacted by student lawyers while he was in protective custody was firmly grounded in the evidence. Specifically, there was evidence that William was an informant during much of his incarceration, and that he had been contacted by law students representing Maryann. At the time Maryann sought to recall William, Maryann had just testified as part of her case-in-chief, and there were conflicts between Mar-

---

**7.** Neither would William's testimony have been cumulative. In order for evidence to be considered "cumulative", it "must be substantially the same as other evidence that has already been received." *State v. Pulse,* 83 Hawai'i 229, 247, 925 P.2d 797, 815 (1996). Manifestly, the evidence that defense counsel sought to establish would not have been cumulative because Deputy Ahn testified after William, and thus the defense had no opportunity to question William about the new information presented to the jury in the form of Deputy Ahn's testimony.

yann's testimony and William's testimony regarding Maryann's representation by law students in the 1990s. This issue hinged on Maryann's testimony and thus William would not have been cross-examined on these inconsistencies during the earlier cross-examination of him in the prosecution's case-in-chief. The fact that William's testimony conflicted with Maryann's made this particular line of questioning critical in presenting a defense by Maryann. Although the jury had previously been alerted to the issue of William's credibility regarding his statements made to the Parole Board, this would make William's potential testimony as to whether the alleged interactions with the law students occurred more relevant, not less.

This situation also illustrates why it is normal trial practice to call adverse witnesses as part of one's case-in-chief. *See* HRE Rule 607. Maryann should have had the opportunity to impeach William based on her earlier testimony. A reference in the defense's closing argument to the inconsistency is no substitute for examination during trial.[8] Simply because William's overall credibility might have been challenged earlier in the trial, does not justify the court's decision to prevent Maryann from calling William to confront him with the conflicts between Maryann's subsequent testimony and William's earlier testimony.

Under our constitutions, Maryann was guaranteed the opportunity to actually ask William questions face-to-face while he was on the stand. Only this would have complied with the compulsory process guarantee that a defendant have the "right to a meaningful defense and a fair trial." *Mitake*, 64 Haw. at 224, 638 P.2d at 329.

### IV.

### A.

The Hawai'i Constitution and the Sixth Amendment to the United States Constitu-

tion provide criminal defendants with the right of confrontation, specifically, that "the accused shall enjoy the right . . . to be confronted with the witnesses against the accused[.]" Haw. Const. art. 1, § 14. "[T]he right to cross-examine witnesses'" and the right "'to call witnesses in one's own behalf'" are "essential to due process." *State v. Pond*, 118 Hawai'i 452, 479, 193 P.3d 368, 395 (2008) (Acoba, J., concurring and dissenting) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). "[T]he right of confrontation affords the accused both the opportunity to challenge the credibility and veracity of the prosecution's witnesses and an occasion for the jury to weigh the demeanor of those witnesses." *State v. Kassebeer*, 118 Hawai'i 493, 193 P.3d 409 (2008) (citations and internal quotation marks omitted). With respect to cross-examining witnesses, "[t]he '[s]ixth [a]mendment [to the U.S. Constitution] is satisfied where sufficient information is elicited to allow the jury to gauge adequately a witness' credibility and to assess his or her motives or possible bias." *State v. Marcos*, 106 Hawai'i 116, 121, 102 P.3d 360, 365 (2004) (emphasis omitted) (quoting *State v. Balisbisana*, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996)).

In *Balisbisana*, the defendant was charged with abuse of family or household member, and at trial, defense counsel sought to introduce evidence about prior bad acts of the complainant, specifically evidence of the complainant's prior conviction for harassment of the defendant. 83 Hawai'i at 112, 924 P.2d at 1218. This court stated that the appropriate inquiry where a violation of the confrontation clause is concerned "is whether the jury had sufficient information from which to make an informed appraisal of [the complainant's] motives and bias[,]" absent the excluded evidence. *Id.* at 116, 924 P.2d at 1222. Based

---

8. The majority maintains that the reference by Maryann to William's refusal to testify in her closing argument was sufficient to satisfy her constitutional rights. *See* majority's opinion at 283, 285, 327 P.3d at 961, 963. However, at the time of closing argument, Maryann had no other option with respect to William's testimony other than drawing the jury's attention to the lack thereof. Although the majority suggests that

Maryann "capitalized" on William's failure to testify, it cannot establish how strong Maryann's case would have been if William had been brought before the court and confronted with evidence that was introduced after his examination in the prosecution's case, beyond mere speculation. The fact that defense counsel made this reference in closing argument also emphasizes the importance of William's testimony at trial.

on the facts of the case, *Balisbisana* concluded that the confrontation clause was violated because defense counsel was not allowed to introduce the fact of the harassment conviction, from which jurors could draw inferences relating to the complainant's credibility. *Id.* It further stated that, " 'the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the complainant's] testimony which provided a crucial link in the proof of [the defendant's] act.' " *Id.* (emphasis added) (internal quotation marks and ellipses omitted) (quoting *Davis v. Alaska,* 415 U.S. 308, 317, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).

In *Marcos,* we analyzed another violation of the confrontation clause, reiterating much of the language from the earlier decision in *Balisbisana. Marcos,* 106 Hawai'i at 121–22, 102 P.3d at 365–66. In *Marcos,* the defendant was also charged with abuse of a family or household member, and at trial, defense counsel sought to cross-examine the complainant on a pending family court case concerning the minor child of the defendant and complainant. *Id.* at 118, 102 P.3d at 362. Defense counsel argued to the court that complainant had a motive to feign the injury allegedly caused by the defendant, because the defendant had indicated that he intended to obtain custody of their child. *Id.* But, the court declined to allow cross-examination on that issue. *Id.*

This court stated that "[b]ecause there were no witnesses to the alleged abuse, complainant's credibility was at issue and evidence of her alleged motive or bias and demeanor bore upon that issue." *Id.* at 123, 102 P.3d at 367. Accordingly, *Marcos* held that defendant's right to confrontation was violated and the case was remanded for a new trial. *Id.* at 122, 102 P.3d at 366.

Although *Balisbisana* and *Marcos* both addressed situations where the defense was precluded entirely from questioning the witness on a particular motive or bias, in *State v. Levell,* 128 Hawai'i 34, 282 P.3d 576 (2012), this court concluded that the defendant's right to confrontation was violated where he was unable to cross-examine the witness to further pursue his existing theory that the

witness had a reason to falsely testify against him. *See* 128 Hawai'i at 40, 282 P.3d at 582. There, the defendant had moved for permission to cross-examine the complainant on whether she had stolen and used his credit cards after he was arrested for the offense of harassment. *Id.* at 37, 282 P.3d at 580. The court did not allow the cross-examination because it concluded that the testimony was not relevant and was outweighed by the risk of unfair prejudice under HRE Rule 403. *Id.* at 40, 282 P.3d at 582.

On appeal, the State argued that the defendant was "given 'considerable latitude' during cross-examination and was able to argue to the court that [c]omplainant fabricated the harassment incident because she wanted to keep [the defendant's] cell phone and stay in his apartment without paying rent." *Id.* at 41, 282 P.3d at 583 (emphasis added). Despite the ability of the defense to cross-examine the complainant on those issues, we held that the defendant's right to confrontation was infringed because the defense could not cross-examine the complainant regarding the alleged credit card theft. *Id.* at 40, 282 P.3d at 582. We first established that the testimony on cross-examination would be relevant. *Levell,* 128 Hawai'i at 40, 282 P.3d at 582. Under HRE Rule 609.1, "[t]he credibility of a witness [such as William] may be attacked by evidence of bias, interest or motive[,]" and "[b]ias, interest or motive is always relevant . . . ." *Id.* (emphasis in original) (quoting *State v. Estrada,* 69 Haw. 204, 738 P.2d 812, 823 (1987)). Evidence is relevant if it has "any tendency to support an inference of the witness' disposition or tendency, consciously or unconsciously, to slant testimony one way or the other, from the straight and true." *Id.* (emphasis in original) (quoting Addison M. Bowman, *Hawai'i Rules of Evidence Manual* (HRE Manual) § 608.1–[1][C] (2010–11 ed.)). *Levell* then explained that, "the court [as factfinder] might have had a significantly different impression of [c]omplainant's credibility had [defense] counsel been permitted to pursue this proposed line of cross-examination." *Id.* at 41, 282 P.3d at 583. Thus, *Levell* concluded that the defendant's right to confrontation had been infringed. *Id.*

### B.

Maryann cross-examined William during his testimony as a witness for the prosecution. However, the jury would <u>not</u> have "had sufficient information from which to make an informed appraisal of [the complainant's] motives and bias[,]" *Balisbisana*, 83 Hawai'i at 116, 924 P.2d at 1222, absent the excluded examination in Maryann's case. William and Maryann were the only witnesses to the murder in this case. As in *Balisbisana, Marcos, and Levell,* this case revolved around testimony by the defendant and another witness who testified to a different version of the key events. As in those cases, here, the prosecution's case against Maryann "hinged on the [fact-finder's] willingness to believe [William's] testimony over [Maryann's] version of the events[.]" *Levell,* 128 Hawai'i at 40, 282 P.3d at 582. Thus, it was absolutely critical that "the jurors ... have the benefit of the defense theory before them so they could make an informed judgement as to the weight to place on [William's] testimony which provided a crucial link in the proof of [Maryann's] act." *Balisbisana,* 83 Hawai'i at 116, 924 P.2d at 1222 (citation and internal quotation marks omitted).

### 1.

As explained, the number of times that William met with Deputy Ahn bolstered William's credibility. Maryann could not have questioned William about this issue during the prosecution's case-in-chief because Deputy Ahn testified <u>after</u> William. Moreover, as described, during closing argument the State sought to show that William had no motive for lying. An examination of William on his informant activities, what he told Deputy Ahn, and what he received in exchange for his initial testimony against Maryann would certainly have a tendency to support an inference in the mind of the jury that William may have, "consciously or unconsciously, [ ] slant[ed] testimony one way or the other, from the straight and true[ ]" in the instant case. *Levell,* 128 Hawai'i at 41, 282 P.3d at 583.

Furthermore, the jurors were entitled to have the full scope of the defense's theory before them—namely, that based on confronting William with Maryann's testimony, William was a liar, and that he had specific motive to lie when he said that Maryann shot Hasker and that she "could have left [at] any time" if she did not want to go along with their plans. Plainly, this examination following Deputy Ahn's and Maryann's testimony would have enabled the jury to "make an informed judgement as to the weight to place on [William's] testimony." *Balisbisana,* 83 Hawai'i at 116, 924 P.2d at 1222 (internal quotation marks omitted).

### 2.

Second, as discussed, the defense sought to further question William on inconsistencies in his testimony regarding his motive for testifying before the Parole Board that Maryann had done "[a]bsolutely nothing." This 1991 testimony before the Parole Board was under oath, and that testimony contradicted William's sworn testimony in the instant case. William explained during the prosecution's case-in-chief that he had testified falsely before the Parole Board in an effort to clear Maryann's liability, based on what some student lawyers from UCLA had allegedly told him. But, this reason was inconsistent with Maryann's testimony about when she was represented by law students, and clashed with the fact that William may have been under protective custody around the time that he was testifying before the Parole Board and thus would not have been accessible to any students.

As explained *supra,* in order for the jury to have properly assessed the evidence before it, it was vital that the jury have been able to consider William's motives when he went before the Parole Board in 1991 in light of Maryann's subsequent testimony in the instant case. These motives were certainly pertinent to whether William's testimony in the instant case was slanted "one way or the other." *Levell,* 128 Hawai'i at 41, 282 P.3d at 583. The defense was thus entitled to counter William with Maryann's rebuttal of his prior testimony to allow the jury to "make an informed judgment as to the weight to place on [William's] testimony which provided a crucial link in the proof of [Maryann's] case." *Balisbisana,* 83 Hawai'i at 116, 924 P.2d at

1222 (internal quotation marks and citation omitted). However, Maryann had <u>no opportunity</u> before the jury to examine William on the testimony that Maryann gave during the defense's case-in-chief.

William's testimony constituted the heart of the prosecution's case against Maryann. Absent an opportunity to examine William about these two issues, and whether William had received other concessions or favors from the government, the jury was deprived of facts on which to adequately assess William's truthfulness. The majority asserts that the jury did have sufficient information, and points to a number of statements William made regarding lying under oath and lying to police and prosecutors. *See* majority's opinion at 285, 285 n. 17, 327 P.3d at 963, 963 n. 17. However, because William recanted his previous prevarication, the testimony sought by the defense was essential to answering questions that would have arisen in the jury's mind regarding whether William was being truthful in this case, and to rebut the prosecution's final argument that William "didn't ask for anything" and "didn't get anything." Yet, William was placed outside the reach of the defense's case. Defense counsel was not able to question William on the defense's own terms. As in *Levell*, the fact finder "might have had a significantly different impression of [William's] credibility had [defense] counsel been permitted to pursue his proposed line of [questioning]." 128 Hawai'i at 41, 282 P.3d at 583.

### V.

As with the constitutional rights articulated above, a trial court's discretion in controlling the presentation of evidence must cede to the defendant's right to a fair trial and right to present a defense. "The due process guarantee of the Federal and Hawai'i constitutions serves to protect the right of an accused in a criminal case to a fundamentally fair trial." *State v. Matafeo,* 71 Haw. 183, 185, 787 P.2d 671, 672 (1990) (citing *State v. Keliiholokai,* 58 Haw. 356, 569 P.2d 891 (1977)). Furthermore, "[c]entral to the protections of due process is the right to be accorded 'a meaningful opportunity to pres-

ent a complete defense.'" *Id.* (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)) (other citation omitted). Thus, "a defendant has the constitutional right to present <u>any and all competent evidence in his defense.</u>" *Kassebeer,* 118 Hawai'i at 514, 193 P.3d at 430. Plainly, Maryann was not afforded a "meaningful opportunity to present a complete defense." *Matafeo,* 71 Haw. at 185, 787 P.2d at 672 (internal citation and quotation marks omitted).

### A.

### 1.

The majority frames the recall issue in terms of whether the court abused its discretion in applying HRE Rule 611(a) (1993). *See* majority's opinion at 284, 327 P.3d at 962.

HRE Rule 611(a) provides:

Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

However, in all cases, the right to present a fair defense must be considered with the other legitimate interests in the criminal trial process. *See Pond,* 118 Hawai'i at 481, 193 P.3d at 397 (Acoba, J. concurring and dissenting). Any rule excluding evidence, including HRE Rule 611(a), must avoid "relegat[ing] the defendant's constitutional rights to that of rule status." *Id.*

Any interpretation of the Federal Rule of Evidence (FRE) Rule 611, which is identical to Hawai'i's HRE Rule 611, must be consistent with the protection of a defendant's constitutional rights. "While Rule 611(a) gives courts broad powers to regulate the mode and order of proof, those powers must be exercised <u>consistent with certain constitutional rights of litigants to present evidence.</u>" Wright and Miller, *Federal Practice and Procedure,* 28 Fed. Prac. & Proc. Evid.

302

§ 6164 (2d ed.) (emphasis added). "In criminal cases, several constitutional rights may be implicated by rulings under Rule 611(a) which are adverse to the accused ... includ[ing] the right to present a defense and the right to testify, which are aspects of the right to due process." *Id. See Chambers*, 410 U.S. at 297, 93 S.Ct. 1038 (due process was violated because state evidence rules effectively prevented the defendant from exploring his claim that another person committed the crime for which the defendant was on trial).

In *United States v. Grande*, 620 F.2d 1026 (4th Cir.1980), the court refused to permit defendants to recall a government witness concerning an exhibit offered into evidence by the government after the witness had been excused subject to recall. 620 F.2d at 1035. The Fourth Circuit held that "[t]he due process clause unquestionably guarantees to a defendant the right to rebut a case proved against him, and this right in turn includes the right to cross-examine the government's witnesses whose testimony incriminates him and to present evidence in his own behalf." *Id.*

Additionally, "[i]t is clear that the courts' powers under Rule 611 cannot be exercised to limit cross-examination of prosecution witnesses until the constitutionally required level of confrontation has been afforded the accused." Wright and Miller, *Federal Practice and Procedure*, 28 Fed. Prac. & Proc. Evid. § 6164 (2d ed.); *see also United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir. 1992) ("The district court's discretion in limiting the scope of cross-examination is subject ... to the requirements of the Sixth Amendment." (citation and internal quotation marks omitted)); *Hoover v. State of Md.*, 714 F.2d 301, 305 (4th Cir.1983) ("The trial judge's traditional discretion to control the limits of cross-examination cannot be exercised until the constitutionally required threshold level of inquiry has been afforded the defendant." (citation and internal quotation marks omitted)); *United States v. Elliott*, 571 F.2d 880, 908 (5th Cir.1978) ("We have long recognized that while the scope of cross-examination is within the discretion of the trial judge, this discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." (internal quotation marks omitted)); *United States v. Garrett*, 542 F.2d 23, 25 (6th Cir.1976) ("[A] limitation on cross-examination which prevents a person charged with a crime from placing before the jury facts from which bias, prejudice or lack of credibility of a prosecution witness might be inferred constitutes denial of the right of confrontation guaranteed by the Sixth Amendment." (citations and internal quotation marks omitted)).

2.

This court has confirmed that the discretion of the court pursuant to HRE Rule 611 is overborne by the defendant's right to a fair trial. For example, in *Grindles*, the trial court bifurcated the two alternate methods of proof for the single offense of driving while under the influence of intoxicating liquor (DUI), by deciding that it would take all testimony from the State and the defendant as to the first method of proving the offense, and then only permit evidence on the second method of proving the offense if the State failed to establish the first. 70 Haw. at 529, 777 P.2d at 1189. This had the effect of requiring that the defendant present "his evidence to the DUI charge before hearing all of the State's evidence against him." *Id.* at 532, 777 P.2d at 1190. *Grindles* held that the defendant's due process right to a fair trial was violated because "the defendant has an absolute right to hear all of the State's evidence against him prior to putting on his defense." *Id.*

Here, Maryann was effectively required to put on her defense before hearing all of the State's evidence against her. Maryann cross-examined William, then the State called Deputy Ahn to testify for the prosecution, and then Maryann presented her testimony, including testimony that conflicted with William's account. Subsequently, Maryann sought to call William to the stand, as part of her case, on matters that were, among other things, relevant to Deputy Ahn's testimony, which, as noted, took place after William had previously testified for the prosecution.

Maryann was denied the opportunity to recall William to testify, and therefore was required to rely only on her prior cross-examination of him, despite the fact that the State had not presented all of its evidence at the time Maryann had cross-examined William.

Thus, by compelling her to rely on her earlier cross-examination, the court effectively required Maryann to put on part of her defense—her inquiry into William's credibility—during the prosecution's case-in-chief, before the State had fully presented its evidence. Therefore, in light of *Grindles*, Maryann's right to a fair trial was violated by the court's refusal to allow Maryann to recall William. *See also State v. Kido*, 102 Hawai'i 369, 379, 76 P.3d 612, 622 (App.2003) (concluding that a violation of defendant's right to due process resulted from the trial court's direction, over defendant's objection, that he testify before his other defense witnesses). This prevented Maryann from presenting a complete defense, because she was not allowed to "present any and all competent evidence" in her defense. *Kassebeer*, 118 Hawai'i at 514, 193 P.3d at 430 (citation omitted).

### B.

Had the court in fact recalled William to the witness stand, it could have easily controlled the presentation of evidence to avoid testimony that was duplicative of what had already been covered during Maryann's earlier cross-examination of William. In *State v. Alfonso*, 65 Haw. 95, 648 P.2d 696 (1982), the trial court allowed the prosecution to recall the complainant to the stand to give additional testimony, even though she had testified earlier in the prosecution's case-in-chief. 65 Haw. at 98, 648 P.2d at 699. *Alfonso* held that the trial court's decision was a valid exercise of its discretion because the prosecution had not rested its case, the complainant was examined off the record to determine the substance of the new testimony, and the court had limited the scope of the direct examination to matters that had not been covered during the victim's previous appearance on the stand. *Id.* at 99, 648 P.2d at 700.

In the instant case, the court did make some effort to ascertain the scope of the issues that Maryann sought to ask William during the defense's case-in-chief. Therefore, like the trial court in *Alfonso*, the court could have limited the scope of William's testimony to issues not addressed during William's previous appearance on the stand. *See id.* Such a result would have avoided duplicative testimony while protecting Maryann's right to a fair trial and right to present a defense.

### C.

Criticism has also been leveled at cases in which the court's discretion has been upheld in the face of constitutional rights. In *Romero v. Hariri*, 80 Hawai'i 450, 911 P.2d 85 (App.1996), a civil case, the plaintiff called the defendant as an adverse witness. 80 Hawai'i at 454, 911 P.2d at 89. The trial court, apparently in an effort to avoid repetitive testimony, asked defense counsel to elect one of three possible procedures: (1) the defendant would, during cross-examination, testify fully about any relevant matter, then forego testimony during his own case-in-chief; (2) the defendant would forego cross-examination following the adversary direct examination, then testify in the usual manner in his case-in-chief; or (3) the defendant's cross-examination would be limited to the matters broached on direct, and his direct examination during his own case-in-chief would be limited to matters not covered during his first appearance. Bowman, *HRE Manual*, at § 611–2[4] (citing *Romero*, 80 Hawai'i at 454, 911 P.2d at 89). The ICA approved the trial court's procedure as an appropriate exercise of discretion under Rule 611(a) "to control the manner in which testimony was gathered from [the d]efendant." *Id.* (quoting *Romero*, 80 Hawai'i at 454, 911 P.2d at 89).

However, the ICA's decision in *Romero* was criticized by Bowman in his treatise on evidence, the Hawai'i Rules of Evidence Manual. *Id.* He stated that the court in *Romero* should have had discretion to "suffer a certain amount of repetition resulting from an accommodation of (1)[the] <u>plaintiff's undoubted right to call and question defendant</u>

about relevant matters, and (2)[the] defendant's legitimate desire not to be compelled to forgo either a contemporaneous 'cross' of himself that explains matters elicited in response to adversary questioning by [the] plaintiff or the ability to supply a reasonably coherent and complete narrative ... during his testimony in his own case-in-chief." *Id.* (emphases added). The instant case illustrates some of Bowman's concerns, chief among them that the court's exercise of discretion would infringe upon the party's right to call and question his adversary about relevant matters in the party's own case-in-chief. *Id.*

As explained, because of the court's "exercise of discretion," Maryann was denied not only her right to compulsory process and right to confront adverse witnesses, but also her right to present a defense and her due process right to a fair trial. Furthermore, as discussed, Maryann was compelled to forgo questioning William during the defense's case-in-chief, and was instead required to elicit all of William's testimony during the initial cross-examination. However, this case was even more egregious than in *Romero*, in that Maryann did not know when she cross-examined William that she would not be allowed to call him as a witness later in the defense's case-in-chief, and could not have foreseen the court's denial of the defendant's fundamental rights that would otherwise be exercised in the ordinary course of trial.

In light of these considerations, it is evident that Maryann's right to a fair trial was infringed by the court's Rule 611(a) decision. The court had ample leeway to fashion an alternate remedy to alleviate any concerns that it may have had with respect to William testifying as part of the defense's case.

## VII.

### A.

Respectfully, the court's application of HRE Rule 611(a) was clearly wrong because it failed to give reasons for its decision. As noted, HRE Rule 611(a) requires that the court's control be in the interest of "(1) mak[ing] the interrogation and presentation effective for the ascertainment of the truth, (2) avoid[ing] needless consumption of time, and (3) protect[ing] witnesses from harassment or undue embarrassment." The court did not explain how its decision to preclude Maryann from recalling William satisfied any of these goals.

Instead, as indicated *supra*, the court simply related to the defense that it did not "think there would be any gain," and it "wouldn't work and wouldn't be helpful[.]" It also related that "the [c]ourt's ... not interested in extracting him because I don't think in the interest of justice and in fairness to both sides that would be helpful." However, because William's credibility was the central issue in the case, the court's denial was detrimental to the ultimate truth-seeking function of the trial.

Second, the court may have intended to avoid "needless consumption of time," HRE Rule 611(a). However, it did not ever state that this was its reason for denying the recall.[9] And, if bringing William to the courtroom would have taken one to two hours, which in itself is unclear, the court should have explained how that was a "needless consumption of time[.]" In a complex trial spanning many days it is difficult to ascertain how one or two hours could justify this decision, particularly where Maryann's constitutional rights were at issue, and William had already testified in the prosecution's case.

The majority emphasizes Deputy Cayetano's testimony that protocol for bringing up William to the courtroom would have involved law enforcement resources. *See* majority's opinion at 282, 327 P.3d at 960. Contrary to the majority's contention, it was never established in the record what exactly would be involved. Although apparently

---

9. The majority asserts that the court was not concerned with the delay, although this is not entirely clear from the record either. *See* majority's opinion at 282, 327 P.3d at 960. If time was not the court's concern, then it may have been expense or inconvenience, as the majority seems to assume. *See* majority's opinion at 283, 327 P.3d at 961. Regardless, it is not apparent from the record what the precise reason was for the court's decision, and respectfully, the majority makes assumptions as to the court's reasoning.

safety protocol could be implemented at the courthouse, the necessity for this was not shown in any specific detail relating to William's particular situation. In any event, the protocol should be irrelevant in the court's ultimate decision, because William was a witness called to testify in a criminal trial, had already testified, and therefore the court had a duty to obtain William's presence in the courtroom. The record does not establish at all that this was not possible, since no effort whatsoever was made to accomplish this.

Third, there is no indication that the court believed that William was being harassed or embarrassed by the defense. As explained, William was a seasoned informant and witness, and did not seem concerned at all to be testifying for the prosecution in this case. Under these circumstances, it would be questionable to contend that any additional testimony on William's part would result in harassment or embarrassment. *See State v. DeCenso,* 5 Haw.App. 127, 133, 681 P.2d 573, 579 (1984). Indeed, the court did not seem to be perturbed by this possibility either. In the absence of explanations as to why the objectives of HRE Rule 611(a) overrode the constitutional protections and the normal course of presenting evidence, it cannot be said that the court properly exercised its discretion. The absence of supporting evidence for the court's decision plainly underscores the lack of a legal basis for the court's decision denying Maryann's recall of William.

In *State v. Cramer,* 129 Hawai'i 296, 299 P.3d 756 (2013), this court recently held that the consideration of one factor alone was not enough to justify the trial court's decision to deny the defendant a continuance. 129 Hawai'i at 302, 299 P.3d at 762 ("The record does not reflect that the circuit court considered, for example, the length of the delay requested, the impact of the delay on the prosecution, witness or the court, and whether the delay was for a dilatory purpose."). Here, the court did not weigh the potential for any supposed inconvenience with the countervailing prejudice to the defendant's case and the resulting infringement of Maryann's constitutional rights. Respectfully, for the lack of articulate reasons alone, the

court's decision with respect to the recall should result in a new trial.

### B.

Even the brief statement by the court was inadequate. The court recognized that William's rights under the Fifth Amendment were not implicated. Yet, the court assumed that William would not testify in the event that he was actually brought to the stand. Contrary to the majority's view, *see* majority opinion at 283, 283, 285–86, 327 P.3d at 961, 961, 963–64, this assumption is clearly erroneous and wrong. William had apparently told Deputy Cayetano that he would not testify, but, there was no way to know whether or not he actually would have testified had he been placed on the stand.

The majority's decision rests on the supposition that William would not have testified. *See* majority's opinion at 283, 327 P.3d at 961 ("Thus, Maryann was not entitled to have William refuse to testify in front of the jury."). However, as discussed, it is not clear what would have happened had William been called to the court, because William never took the stand. Thus, the issue is not whether William would refuse to testify in front of the jury, but whether the court should have brought William to the courtroom to ascertain for itself whether any impediments to his testifying justifiably existed.

The court seemed to assume that it had no ability to persuade William to testify because he was already serving a life sentence. It stated that "[t]here's not much I can do [be]cause he's doing life." The majority makes a similar assumption. *See* majority's opinion at 284, 327 P.3d at 962 ("[T]here is no suggestion in the record that an exchange [between the court and William] would have persuaded William to testify"). But there is nothing in the record that would indicate William, upon inquiry by the court, would not have testified. No conclusion can reasonably be reached as to what would have occurred, because the record is simply devoid of a colloquy in open court. The court overlooked the fact that William would be compelled to testify because he had been granted immunity. These were not "unique circumstances", majority's opinion at 284, 327 P.3d at 962,

that can justify the court's action, because we cannot know whether the court could have persuaded William to testify, inasmuch as his failure to testify could have impacted the agreement he made regarding his appearance in court. The court therefore wrongly relied on William's statements to Deputy Cayetano. The deputy's conversation with William cannot substitute for a judge's admonition in court to a witness requiring that he testify.

### C.

Consequently, it cannot be emphasized enough that the court <u>did not know</u> whether William would in fact testify, because William was never questioned by the court. The court <u>never inquired</u> of William about his refusal to testify, but relied solely on what William told the deputy. The court had a duty to address the witness personally in court to vindicate the subpoena.[10] Plainly, the deputy was not a proxy for the court. Moreover, we do not know exactly what Deputy Cayetano said to William with respect to the questions he would be asked, or how the conversation may have contributed to William's apparent decision not to testify. The majority notes that "Deputy Sheriff Cayetano testified under oath that William was informed of why he was brought to the courthouse and that he had been subpoenaed to testify." Majority's opinion at 283, 327 P.3d at 961. However, William was also apparently told what issues he would be testifying about, "with regard to the cooperation or testimony he's given in other cases on the mainland." We do not know how Deputy Cayetano explained this to William, but the generalized way in which the statement was posed may have contributed to William's concerns about testifying. It would appear apparent that the court would have been better able to explicate to William the scope of the issues to be covered during his testimony. Significantly, the parties—including defense counsel—were prevented from examining William as to the reasons why he would not

testify. Obviously, the defense had the right to ascertain William's veracity under oath on this specific issue, for purposes of mounting its defense and for argument to the court as to why the court should compel William's testimony.

### D.

Furthermore, respectfully, although the court explained that its decision was in "the interest of justice and [ ] fairness to both sides", this cannot be true given the facts. The failure to secure William to testify in the defense's case, where he had already testified at length for the prosecution, was inimical to the interest of justice and fundamentally unfair. Rather, the interest of justice and fairness mandated that William be called to testify in the defense's case, where he had already testified at length for the prosecution. The court recognized as much when it acknowledged that "[William] came in not voluntarily, under subpoena, for [the prosecution] and in agreement. Now he refuses to do it for [defense counsel]." Although the court perceived the inequity, it did nothing to remedy the manifest prejudice to Maryann by this tactic. The majority states that "because William refused to testify, the circuit court was not presented with the option of presenting William's testimony to the jury." Majority's opinion at 286, 327 P.3d at 964. However, this again assumes that William would not have testified had he been put on the stand. And to the contrary, the court <u>was</u> presented with the option of ascertaining for itself, in person, subject to examination by counsel and on the record, that William would or would not testify, and to use its judicial offices to admonish William of his obligations as one subpoenaed to testify by court order.

Under the circumstances of this case, as Maryann argues, it was patently wrong for the court not to order that William be brought to the stand so that the court itself could ascertain, through a face-to-face inter-

---

**10.** The majority avers that the court "did not abuse its discretion in not personally addressing William sua sponte." Majority's opinion at 284, 327 P.3d at 962. "[S]ua sponte" implies that the court had no duty to address William personally,

however, the court did have the obligation to ensure that Maryann had the opportunity to obtain William's testimony and personally addressing William was part of that task.

action, the basis and appropriateness of William's position and to consider such measures as would be appropriate. For, it was obviously unfair to deny the defense the same opportunity that the prosecution had to ask William questions during its case-in-chief. This incongruity between the treatment of the prosecution's case-in-chief and the defense's case-in-chief with respect to William's testimony manifestly violated Maryann's due process right to a fair trial and prevented Maryann from presenting all competent evidence in her defense.

### E.

It cannot be doubted that Deputy Cayetano was not an adequate replacement for William. Deputy Cayetano conveyed to the jury that William was informed that he had been subpoenaed to testify for the defense, and that William had refused to come to the courtroom. However, there is no way of knowing if this would have been consistent with what William would have conveyed to the jury had he actually been put on the stand, for William had already testified in the prosecution's case.[11]

Also, Deputy Cayetano's testimony before the jury was hearsay.[12] Indeed, the prosecutor alleged that the deputy's testimony as to William's statement would be hearsay. Deputy Cayetano testified that William would not obey the subpoena, and would refuse to answer questions under oath regarding his knowledge of the case. William's refusal to testify was offered to the jury for "the truth of the matter asserted." That is, the jury was to believe that William in fact refused to testify. Therefore, Deputy Cayetano's testimony regarding William's refusal to testify was hearsay.

As noted before, defense counsel had little choice but to request that Deputy Cayetano relate to the jury that William refused to testify. The majority makes much of the fact that Maryann agreed to Deputy Cayetano's testimony, *see* majority's opinion at 282–83, 327 P.3d at 960–61, but the court itself initially proposed that option. The court asked "[y]ou want to put [Deputy] Cayetano on [the stand] and let [the jury] know that [William] just simply refuses to come out?" After the court decided not to have William brought to the courtroom, Maryann was without viable options, and was left with the avenue mentioned by the court.

Furthermore, the deputy's testimony may have demonstrated that William could effectively choose not to testify for the defense, and avoid facing the jury in the courtroom. It would have appeared to the jury that Maryann did not have a right to compel his testimony and to cross-examine him on evidence that had been subsequently introduced. Deputy Cayetano related that "[William is] physically in the cell block, but he's refusing to come to this particular courtroom." This had to have had a significant impact on the jury and the defendant's ability to present a defense.[13] The failure to place William on the stand verified that he legally had the right to refuse to testify and that the defense had no legal right to have him testify, much less to confront him with Deputy Ahn's testimony and Maryann's version of the events. The court, in effect, kept William from the scrutiny of the jury's deliberation and thereby allowed the prosecution's

11. The majority notes that the court stated that Deputy Cayetano could be called as a witness "out of a concern for fairness and in order to avoid any juror confusion." Majority's opinion at 271, 327 P.3d at 949; *see also* majority's opinion at 282, 327 P.3d at 960. Respectfully, it is not evident how the testimony of Deputy Cayetano would avoid any juror confusion, but surely added to it, since William had testified previously.

12. HRE Rule 801 (Supp.2002) provides that, for purposes of the hearsay rule, " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in

evidence to prove the truth of the matter asserted." A " '[s]tatement' is an oral assertion, an assertion in writing or nonverbal conduct of a person, if it is intended by the person a an assertion." HRE Rule 801.

13. Contrary to the majority's assertion, the fact that Deputy Cayetano's testimony was introduced cannot support a conclusion that Maryann's right to compulsory process and her right to a fair trial were satisfied. Majority's opinion at 283, 327 P.3d at 961. As noted, the impetus to have Deputy Cayetano testify initially came from the court, not Maryann. Maryann was left without a choice.

argument that William asked for nothing and received nothing to go unchallenged, despite Deputy Ahn's and Maryann's testimony. Consequently, for the several reasons recounted, Deputy Cayetano's testimony was an acutely inappropriate substitute for William's live testimony on the stand.

### F.

In offering post hoc reasons to justify the court's refusal to recall William to testify, the majority emphasizes William's concern for his safety as a valid reason for the court to decide not to recall him as a witness for the defense. Majority's opinion at 285–86, 327 P.3d at 963–64. Respectfully, this is simply implausible. Of course, the court never expressly indicated this as one the reasons for its decision.

This would fly in the face of the facts and the record. The majority refers to William's declaration and a letter from California authorities "emphaz[ing] the importance of protecting William" inasmuch as he had "provided the Department of Corrections and Rehabilitation with highly sensitive information." Majority's opinion at 286, 327 P.3d at 964. Yet, this declaration was given before trial, and William subsequently testified for three days as a witness for the prosecution. The court had granted William's motion prohibiting video, photographic, or sketch art images of William at trial.

The record does not indicate that William or the prosecution requested any other safety measures. Safety was not raised as an issue when William had been cross-examined by the defense during the prosecution's case. Nothing indicated examination during the defendant's case posed more danger. Simply put, no one considered safety concerns because William had already testified for the prosecution for three days. Obviously, any limits on William's testimony could have been raised and ruled on during William's testimony, without prohibiting defense counsel from questioning him in the defense's case at all.

William suddenly decided that his safety was compromised by testifying as part of the defense's case-in-chief. The alleged concerns for his safety only during Maryann's case-in-

chief ring hollow in light of his direct and redirect testimony and cross-examination in the prosecution's case-in-chief. Plainly, safety was not a valid reason for the court's refusal to recall William. The use of this excuse for prohibiting the defense to confront William in its own case unequivocally contravened Maryann's right to a fair trial. It is not up to the witnesses to decide who they will testify for, and whether they will testify. A witness cannot be strictly limited to aiding the prosecution's case only. Respectfully, the court ceded management of the trial to William without regard to complete and equal access to the witnesses inhering in the right to a fair trial. Maryann was precluded from presenting "any and all competent evidence in [her] defense." *Kassebeer*, 118 Hawai'i at 514, 193 P.3d at 430.

### VIII.

The errors in the instant case were not harmless. Thus the case must be remanded for a new trial. We have held that "[t]he 'denial of a defendant's constitutionally protected opportunity to impeach a witness for bias, motive, or interest is subject to harmless error analysis.' " *Levell*, 128 Hawai'i at 41, 282 P.3d at 583 (quoting *Balisbisana*, 83 Hawai'i at 117, 924 P.2d at 1223). Consequently, "[e]rror that infringes on one's constitutionally protected right[s] cannot be said to be harmless beyond a reasonable doubt." *State v. Schnabel*, 127 Hawai'i 432, 450, 279 P.3d 1237, 1255 (2012) (citing *State v. Cuevas*, 53 Haw. 110, 115, 488 P.2d 322, 325 (1971) (concluding that "error is neither unimportant nor insignificant" where "it infringes upon a basic right[s] of the accuse[d]"; "[in such instances, the error] raises a reasonable possibility that it might have contributed to the conviction" such that it "cannot [be said] that it was harmless beyond a reasonable doubt") (other citations omitted)). "The relevant question under the harmless beyond a reasonable doubt standard is ' "whether there is a reasonable possibility that error might have contributed to conviction." ' " *Schnabel*, 127 Hawai'i at 450, 279 P.3d at 1255 (emphases in original) (quoting *State v. Duncan*, 101 Hawai'i 269, 278, 67 P.3d at 768, 777 (2003) (other citation and internal quotation marks omitted)).

This case was essentially about the believability of Maryann's version as opposed William's version of Hasker's murder. William's testimony was that Maryann was free to leave at any time, and thus was a willing participant in the murder. On the other hand, Maryann's testimony was that she was intimidated and coerced into taking part in the events leading up to and culminating in, Hasker's murder. Thus, whether Maryann was a willing participant or not was the determinative issue.

With the credibility of William and Maryann as the paramount concern for the jury, the harmless error analysis turns on the fact that we cannot know what William's testimony would have been, had the court permitted him to be called as a witness in the defense's case-in-chief. For example, it is possible that upon examination, defense counsel could have discredited William's alleged motive for testifying to the Parole Board that Maryann did "[a]bsolutely nothing", and as a result, the jury may have concluded that William was telling the truth before the Parole Board and lying in this case. Or, William's additional testimony may have further called into question his ability to tell the truth while under oath. Any of these scenarios could have changed the result in favor of Maryann in the minds of the jurors, or led them to the conclusion that Maryann's guilt had not been proven beyond a reasonable doubt. Thus, the errors in this case were not harmless beyond a reasonable doubt.

IX.

In light of the foregoing, the ICA's November 9, 2012 Judgment, filed pursuant to its October 12, 2012 Memorandum Opinion, and the Judgment of Conviction and Sentence entered by the court on November 9, 2009 should be vacated. The case should be remanded for a new trial.